**H. B. SNIVELY, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 14927.

United States Court of Appeals, Fifth Circuit.

Feb. 11, 1955.

William R. Frazier, James P. Hill, Jacksonville, Fla., Harry E. King, Winter Haven, Fla., Hill & Frazier, Jacksonville, Fla., for petitioner.

Meyer Rothwacke, Ellis N. Slack, Lee A. Jackson, Karl Schmeidler, Sp. Assts. to Atty. Gen., D. of J., Washington, D. C., H. Brian Holland, Asst. Atty. Gen., D. of J., Daniel A. Taylor, Chief Counsel, Int. Rev. Serv., Charles E. Lowery, Sp. Atty., Int. Rev. Serv., Washington, D. C., for respondent.

Before HUTCHESON, Chief Judge, and RIVES and TUTTLE, Circuit Judges.

TUTTLE, Circuit Judge.

The question here for decision is whether the Tax Court erred in holding that citrus fruit harvested from a grove owned by a corporation which it had been determined should be liquidated, and with respect to which a petition to the appropriate state court for dissolution had been filed, but which remained in existence for several months following the sale resulted in income to the corporation or to the sole stockholder who had directed that the sales be made for his personal account, and where, on final liquidation, not only the crops but also the entire assets of the corporation would pass to him.

The basic facts are not in dispute. The taxpayer desired to buy the orange grove in question from Meloso Fruit Company, a corporation which owned it, and in which he was not a stockholder. The corporation declined to sell because it did not want to incur the tax liability resulting from the gain it would realize if it sold the grove at its then value. Meloso's stockholders, however, offered their stock to the taxpayer for $110,000. This offer was accepted by him after his lawyer and accountant advised him he could liquidate the corporation thus acquired and take ownership of the grove.

On March 17, 1943 an agreement was made for the sale of the stock. It provided that upon payment of $25,000 cash the shares should be deposited in escrow with Exchange National Bank of Winter Haven to be delivered to Snively upon full payment of the balance of the purchase

price, amounting to $85,000. It was also agreed that Snively was permitted to direct sales of any fruit made by Meloso until July 15, 1948. Receipts from such sales were to be deposited to the company's account and not to be disbursed without Snively's consent except for certain current obligations. Meloso stockholders were to deliver their stock to the bank prior to July 15th and petitioner was to pay the purchase price on that date.

The stock certificates were delivered to the escrow agent on April 8th and they were thus ready for delivery to Snively when payment was completed by him. On July 14th proceeds from fruit sales by Meloso had produced $45,144.41. On that date this balance was increased to slightly more than $85,000 by a deposit in the amount of $40,000 which included the proceeds of a $25,000 loan from the Federal Land Bank, a $7,500 loan from the Land Bank Commissioner, both of which were borrowed in the name of Frank Snively, taxpayer's son, and the proceeds of a $10,000 loan made by Meloso from the Exchange National Bank. In order to make the first two loans possible, title to the groves were conveyed by Meloso to Frank Snively for the closing of the loans on July 14th. He executed a deed of reconveyance on August 3rd and delivered it to the lawyer handling taxpayer's matters, who was also acting for the corporation in its projected dissolution. The lawyer kept the deed in his safe until December 30th, on which day he had it recorded.

On July 15th a check for $85,000, drawn on Meloso's account, was delivered to the escrow agent in full payment for the stock. The stock was not delivered to Snively until October 19th, because the certificates were pledged with the bank as security for the $10,000 loan made by Meloso. This loan was paid off on that day and the stock certificates were then transferred to Snively.

It is clear that Snively intended at all times to liquidate the corporation in order to become the owner of the groves. On July 7th, before the stock was paid for, and before Snively had any legal right to control the corporation, he and his associates filed a petition in the Circuit Court to dissolve the corporation. The court ordered publication of notice stating that a final hearing would be held on July 13th, and that in absence of cause shown, an order dissolving the corporation would issue. The scheduled hearing was not held and no further formal action was taken towards a dissolution until December 13th, at which time taxpayer and his associates held special meetings which specifically authorized dissolution of Meloso and conveyance of its assets to taxpayer as sole stockholder. On December 20th a new notice was ordered by the Circuit Court reciting that a hearing would be held on December 31st. This hearing was held, the court entered an order dissolving the corporation on that day and all of its assets were conveyed to Snively.

Throughout the late summer and early fall of 1943 Meloso made arrangements for the cultivation and care of the citrus grove. Some early fruit was sold to Great Southern Fruit Company for $14,978.18. This amount was recorded as fruit income on the corporation's 1943 income tax return. Taxpayer claims this was in error. Later in the fall of 1943 other fruit was also harvested from the Meloso grove and was handled by Lake Hamilton Cooperative, Inc. at Snively's request and for his personal account. The proceeds of these sales were $40,683.75. The taxpayer reported the net proceeds from these sales on his personal return, but the Commissioner determined that Meloso's gross receipts of fruit for 1943 should include the sum of $40,683.75. It is this single adjustment which gives rise to the claimed deficiencies in declared value excess profits tax and excess profits tax involved in the case. The taxpayer as transferee of the corporation stands liable for any deficiency.

The Tax Court concluded that on the undisputed facts the income was the corporation's. We find ourselves in agreement with this result.

268

At the time the fruit in question was being harvested and sold, the corporation was in full corporate existence. A petition looking towards its dissolution had been filed, but on the day after the date on which the hearing had been set, the corporation signed a 90-day promissory note for $10,000, the hearing in the meantime having been abandoned. The fact of this corporate borrowing appears to be sufficient indication of itself as to why the planned dissolution was postponed. The claim that there was an assignment of this fruit in liquidation is negatived not only by the absence of any corporation action to that end, but also by the handling of the title to the grove itself. Title was placed in petitioner's son for the convenience of Meloso in borrowing $32,500. Petitioner testified that his whole purpose in acquiring the stock was to obtain the grove for his two sons, but here, with the title to the grove already in one of the sons, instead of having a half interest in it conveyed to the other son, petitioner's advisors caused it to be reconveyed to the corporation and retained there until December 31st.

Furthermore, as the Tax Court pointed out, expenses of cultivating the grove and maintaining the trees during the harvesting season were borne by the corporation.

When petitioner determined to acquire the stock of Meloso in order to get the grove on liquidation he was, of course, aware of the technical and substantial differences between the acquisition of the stock and the acquisition of the property. He now stands in the position of asserting that so far as relates to the sale of the bulk of the 1943 crop there was no difference. We do not need to pass on the question whether if there

had been a complete liquidation on July 13th, as originally contemplated, this income would still be taxable to the corporation under Section 45 of the Internal Revenue Code,[1] "clearly to reflect the income" of Meloso. As was said by the Tax Court "Discussion of the applicability of Section 45 is unnecessary. We hold the income was that [of] Meloso and so is taxable under Section 22(a)."

Petitioner strongly urges on us that we follow the decision of the Court of Appeals for the Ninth Circuit in Gensinger v. Commissioner of Internal Revenue, 9 Cir., 208 F.2d 576. We think that, though somewhat similar, the cases are distinguishable on their facts. Under the Washington statute, the sole stockholder, Gensinger, was appointed trustee to liquidate and dissolve the corporation before the fruit was sold for his account. He thus had complete control of the corporation's assets with power to convey them to himself. Moreover, the corporation was in actual liquidation under the Washington law and its debts were all paid and its books closed. In the case of Meloso the corporate status remained unchanged until the order of dissolution was signed by the Court on December 31st, and the company's accounting period continued until December 31st. Nothing is shown that would place Snively in a position comparable to that occupied by Gensinger under the Washington procedure.

This case is also distinguishable on its facts from Howell Turpentine Co. v. Commissioner of Internal Revenue, 5 Cir., 162 F.2d 319, and Wurtsbaugh v. Commissioner of Internal Revenue, 5 Cir., 187 F.2d 975, since the status as to liquidation and transaction of other business by the respective corporations in-

[1] "26 U.S.C.A. § 45. Allocation of income and deductions

"In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income or deductions between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades or business." 53 Stat. 25.

volved differs materially from that of Meloso.

Not only did the taxpayer here fail to sustain his burden of proving that the sales in question were of fruit that belonged to him, but there is ample justification for the conclusion of the Tax Court that the sales were made by Meloso and the proceeds were taxable to it.

Affirmed