*Decisions will be entered under Rule 50.*

A.B.C.D. Lands, Inc., Petitioner, *v.* Commissioner of Internal Revenue, Respondent

Docket No. 463–63.   Filed March 17, 1964.

*Thomas B. Stoel* and *Milo E. Ormseth,* for the petitioner.
*H. Kent Holman,* for the respondent.

842

844

OPINION

It is petitioner's position essentially that no amount is includable in its gross income during the years 1958 through 1961 on account of certain crop share rents paid to it by its tenant farmers and then purportedly distributed by it to its stockholders as a dividend in kind. Petitioner argues first that it realized no income at the time the crop share rents were paid to it by its tenant farmers by virtue of section 1.61–4(a) of the Income Tax Regulations.[8]  Petitioner next contends, relying upon the provisions of section 311(a),[9] that it did not, by its distribution of the crop share rents to its stockholders, realize income, either at the time of the distribution or at the time of the ultimate disposition of these crops by its stockholders (whether by outright sale or by pledge of the crops under CCC loan).[10]

Respondent does not dispute that petitioner did not realize income either upon its receipt of the crop share rents or upon its distribution of said crop shares as a dividend in kind.  However, respondent maintains that the proceeds received by petitioner's stockholders upon their disposition of the crops are includable in petitioner's gross income upon the ground that the sales or pledges of the crops were in substance made by the petitioner.  In the alternative, respondent

---

[8] Sec. 1.61–4, Income Tax Regs., in both subsec. (a) thereof (dealing with farmers using the cash method of accounting) and (b) thereof (dealing with farmers using the accrual method), provides:

> Crop shares (whether or not considered rent under State law) shall be included in gross income as of the year in which the crop shares are reduced to money or the equivalent of money.

[9] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended.

[10] Respondent, as indicated by the amounts upon which the amended deficiencies are based, is evidently relying upon sec. 77, I.R.C. 1954, which provides that the proceeds of CCC loans shall, at the election of the taxpayer, be considered as income in the taxable year received.  Petitioner correctly points out in its reply brief that (1) the provisions of that section are operative only if the taxpayer makes the necessary election and (2) there is entirely lacking in the record any indication that either petitioner or its stockholders ever made any such election.  However, petitioner conceded this issue.  Thus, petitioner in its reply brief stated: "Petitioner does not urge the omission in the record regarding the Sec. 77 election as a ground for refusal to sustain the amended deficiencies; * * *."  Pursuant to sec. 77, if the loans were redeemed, any amounts received upon the sale of the redeemed commodities in excess of the loan proceeds would be includable at the time of receipt.

argues that each distribution by petitioner, under the circumstances herein involved, was an anticipatory assignment of income.

Section 311(a), which originated in the Internal Revenue Code of 1954 and has no counterpart in prior revenue acts, provides that, aside from certain statutory exceptions not relevant hereto, a corporation shall recognize no gain or loss upon the distribution of property with respect to its stock. Although on its face this section seems to state unequivocally that, aside from the exceptions mentioned in the statute, the distribution of a dividend in kind cannot result in gain or loss to the distributing corporation, nevertheless, it is clear that Congress did not intend to change existing law and relieve the corporation from paying a tax where, under decisional law, income received by its stockholders was attributable to the corporation. S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. 247 (1954).

Petitioner acknowledges that in addition to the above-mentioned statutory exceptions to the general rule in section 311 of nonrecognition, there are at least two additional exceptions, which if applicable, would cause a corporation to recognize gain or loss in connection with its distribution of property with respect to its stock. Thus, where property distributed as a dividend in kind is, from a standpoint of form or appearance, sold by the stockholder receiving such property, the sale proceeds are to be imputed to the corporation if, in effect, the corporation made the sale. See *United States* v. *Lynch*, 192 F. 2d 718 (C.A. 9, 1951), certiorari denied 343 U.S. 934 (1952) ; and sec. 1.311–1(a), Income Tax Regs. Also cf. *Commissioner* v. *Transport Trad. & Term. Corp.*, 176 F. 2d 570 (C.A. 2, 1949), reversing 9 T.C. 247 (1947), certiorari denied 339 U.S. 916 (1950) ; *H. B. Snively*, 19 T.C. 850, 857 (1953), affd. 219 F. 2d 266 (C.A. 5, 1955) ; and *Commissioner* v. *First State Bank*, 168 F. 2d 1004, concurring opinion at 1011 (C.A. 5, 1948), reversing 8 T.C. 831 (1947), certiorari denied 335 U.S. 867 (1948). The other nonstatutory exception to the general rule of nonrecognition in the case of a corporation distributing dividends in kind is that where the distribution constitutes an anticipatory assignment of income the income received by the stockholder is to be taxed to the corporation. Sec. 1.311–1(a), Income Tax Regs.; and *Rudco Oil & Gas Co.* v. *United States*, 82 F. Supp. 746 (Ct. Cl. 1949). Cf. also *Commissioner* v. *First State Bank, supra;* and *United States* v. *Joliet & Chicago R. Co.*, 315 U.S. 44 (1942).

As for the exception whereby the sale is to be imputed to the distributing corporation, petitioner first attempts to distinguish the decisions in *Commissioner* v. *Transport Trad. & Term. Corp., supra,* and *United States* v. *Lynch, supra,* on the ground that (1) in the former case the sale of the asset there distributed had been negotiated by the distributing corporation, and had to a large extent been committed, prior

to the distribution, and (2) in the latter case the facilities of the distributing corporation were used to effect the sale of the property purportedly distributed to the shareholders. These tenuous distinctions can in no way abate the forceful applicability of the rationales of these decisions to the facts present in the instant proceeding.

The petitioner candidly admits that the overriding purpose of its yearly distribution of a portion of its crop share rents to its stockholders was to avoid the corporate income tax thereon. Thus, the transactions herein involved are subject to the most intensive scrutiny, and petitioner must be unusually persuasive in its legal argument when it attempts to demonstrate that Congress intended to give favorable tax treatment to the kind of transaction that would never occur absent the motive of tax avoidance. *Gregory* v. *Helvering*, 293 U.S. 465 (1935); *Commissioner* v. *Transport Trad. & Term. Corp.*, *supra* at 572; *United States* v. *Lynch*, *supra* at 720; and *Diggs* v. *Commissioner*, 281 F. 2d 326, 330 (C.A. 2, 1960), affirming a Memorandum Opinion of this Court, certiorari denied 364 U.S. 908 (1960).

It is clear that petitioner's stockholders caused the transfer to themselves of legal title to a portion of petitioner's crop share rents in each of the years 1958 through 1961 with the knowledge and expectation that virtually immediately thereafter the grains would be sold or pledged by them as security for CCC loans (and then depending upon market conditions the grains would either be forfeited or redeemed and sold).

In our Findings of Fact we listed the various factors in the record which led us to this conclusion. Some of those on which we rely are (1) that Geoffrey, the president and major stockholder of petitioner, prior to causing the first distribution, assured himself that the stockholders would be permitted, pursuant to Department of Agriculture regulations, to sell or hypothecate the grains to be "distributed"; (2) that petitioner agreed with its local agent that the fee owed to it by petitioner would be paid by the stockholders upon their disposition of the grains; (3) that petitioner arranged with its local agent to have the warehouse receipts evidencing ownership of the grains reissued in the names of petitioner's stockholders so as to facilitate the disposition of the grains; and (4) that in the years in which a "distribution" occurred, the grains were sold or pledged under CCC loans shortly after legal title to the grains was transferred to the stockholders.

Petitioner argues that the *Lynch* and *Transport Trad. & Term. Corp.* decisions are not apposite because petitioner's stockholders, in disposing of the crops they received as a dividend, did not avail themselves of petitioner's facilities or its corporate form. In answer to this, reference is made to the pertinent Department of Agriculture regulations which indicate that petitioner's stockholders may very well have relied upon petitioner's corporate form to a large extent in the disposition of the wheat "distributed" to them. The record reveals

that each of petitioner's stockholders was issued in his own name a wheat marketing certificate, which he used in connection with selling the wheat "distributed" by petitioner. The applicable portions of the Department of Agriculture regulations for the years involved indicate that only a "producer" of wheat or a "successor in interest" would have been permitted to dispose of the wheat by use of marketing certificates.[11]  Petitioner's stockholders could not be considered a "producer" or a "successor in interest" under the applicable definitions, but would have to be an "intermediate buyer."[12]  Although petitioner's stockholders, as intermediate buyers, would have been permitted under the applicable regulations to dispose of the wheat distributed to them, they could not have done so pursuant to the authority of a wheat marketing certificate,[13] but could have done so only pursuant to the authority of "an intermediate buyer's record and report."[14]  Thus, it may well be that the local office of the Department of Agriculture, which issued the wheat marketing certificates to petitioner's stockholders, as individuals, was treating the transaction as though peti-

---

[11] 6 C.F.R. secs. 728.868 and 728.865 (for the years 1958, 1959, and 1960) ; 6 C.F.R. secs. 728.1158 and 728.1155 (for the years 1961 to date).

[12] Petitioner on brief concedes that the stockholders should be considered "intermediate buyers." Under the applicable regulations, these terms are defined as follows:

"'Producer' means a person who as owner, landlord, tenant, or sharecropper, is entitled to all or a share of the wheat crop or of the proceeds thereof." (6 C.F.R. sec. 728.851(j) (for the years 1958 through 1960) ; see also 6 CFR secs. 728.1141 and 719.2(s) (with respect to the years 1961 to date).)

"Successors-in-interest. * * * any person who succeeds to the interest of a producer in a farm or in a wheat crop produced on a farm for which a farm marketing quota and farm marketing excess were established shall, to the same extent of his predecessor, be entitled to all the rights and privileges incident to such marketing quota and marketing excess and be subject to the restrictions on the marketing of wheat. * * * If a successor-in-interest should acquire from a deceased producer wheat subject to the lien for the penalty, no marketing card or marketing certificate shall be issued to permit the successor-in-interest to market the wheat penalty free until the penalty has been satisfied." (6 C.F.R. sec. 728.865 (with respect to the years 1958, 1959, and 1960) ; 6 CFR sec. 728.1155 (with respect to the years 1961 to date).)

"'Intermediate buyer' means any buyer or transferee who purchases or acquires any wheat prior to the time the wheat purchased or acquired has been marketed either (1) to a warehouseman, elevator operator, feeder, or processor, or (2) to any other grain dealer who conducts his business in a manner substantially the same as a warehouseman or elevator operator." (6 CFR sec. 728.851(p) (with respect to the years 1958, 1959, and 1960) ; 6 CFR sec. 728.1141(n) (with respect to the years 1961 to date).)

The parties stipulated that, in connection with each distribution, wheat marketing certificates were obtained on behalf of each of petitioner's stockholders as a "successor-in-interest." To the extent that the stipulation provides that wheat marketing certificates were obtained on behalf of petitioner's stockholders, it is a valid stipulation of facts. To the extent it provides that the certificates were issued to the stockholders in the capacity of "successor-in-interest" under the applicable Department of Agriculture regulations, it is a conclusion of law. This Court cannot be bound by stipulations as to law. See *Ohio Clover Leaf Dairy Co.*, 8 B.T.A. 1249 (1927), affd. per curiam 34 F. 2d 1022 (C.A. 6, 1929), certiorari denied 280 U.S. 588 (1929) ; *McClintock-Trunkey Co.*, 19 T.C. 297, 304 (1952), reversed on another issue 217 F. 2d 329 (C.A. 9, 1954). Therefore, the stipulation of facts is set aside to the extent it sets forth the capacity in which the stockholders received the certificates.

[13] 6 C.F.R. secs. 728.868, 728.869, 728.871(b), 728.875(a), and 728.883(e) (with respect to the years 1958, 1959, and 1960) ; 6 C.F.R. secs. 728.1158, 728.1159, 728.1161(b), 728.1165(a), and 728.1173(e) (with respect to the years 1961 to date).

[14] 6 C.F.R. secs. 728.871(c), 728.875(b), 728.883(d), and 728.884 (with respect to the years 1958, 1959, and 1960) ; 6 C.F.R. secs. 728.1161(c), 728.1165(b), 728.1173(d), and 728.1174 (with respect to the years 1961 to date).

850

tioner, which met the definition of "producer," would be making the sale. A similar result is suggested by reference to the relevant Department of Agriculture regulations concerning CCC loans on wheat. In pertinent part, these provide that in order to qualify for hypothecation, the wheat must have been produced by an eligible producer and that it must be owned at the time of the loan by a "producer" or his "successor-in-interest." Petitioner's stockholders could not have qualified as such during the years in question.[15] Nevertheless, both Geoffrey and Jessie did secure, in their own names, CCC loans on a portion of the wheat "distributed" in 1959. Because of the applicable regulations governing the Government's Crop Wheat Loan and Purchase Agreement Program, only petitioner, and not its stockholders, was eligible to procure CCC loans. The only conditions under which the stockholders could have obtained CCC loans would be if the local office of the Department of Agriculture (which entered into the loans with Geoffrey and Jessie) had regarded the situation as one in which petitioner, in effect, were making the loan. Thus, at least to this extent, Geoffrey and Jessie must have utilized one of petitioner's facilities, namely, its corporate form.

Another factor indicating that the stockholders, in substance although not in appearance, relied upon petitioner to make the sales is that prior to the first distribution Geoffrey, as petitioner's president, described to its local agent, A. B. Dorsey & Son, the terms of the "distribution" (including the anticipated sales of the distributed grains by petitioner's stockholders). Moreover, Geoffrey, at that time and in each year subsequent thereto, requested A. B. Dorsey & Son to make the necessary arrangements for transferring legal title in the grains to petitioner's stockholders and for carrying out the actual mechanics of the anticipated sales of the grains. To this extent, it can be said the stockholders relied upon petitioner to make the basic arrangements with respect to the disposition of the "distributed" grains.

However, even disregarding these uses of petitioner's facilities by the stockholders in disposing of the crops, we find it of no significance that under the circumstances herein involved that, from a standpoint of form or appearance, the grains were sold or pledged under CCC loan by petitioner's stockholders rather than by petitioner. Unlike the situation in *United States* v. *Lynch, supra,* the petitioner herein had no other facilities, aside from those mentioned above, which the stockholders could have found useful for purposes of effecting the sales. Petitioner was merely an absentee landowner whose day-to-day problems were administered by its local agent. It had no sales force. Petitioner would have sold or pledged the grains in the very same way that its stockholders did, namely, by directing the local agent either to sell, or pledge the grains with the CCC. Moreover, since there was

[15] 6 CFR sec. 421.3038 (with respect to the year 1959). These provisions are currently found in 6 CFR secs. 421.1203, 421.1204 (revised as of Jan. 1, 1963).

a quoted market price for the grains and a ready market, no negotiations had to be conducted. Petitioner's local agent, which had agreed with petitioner to market the grains distributed to the stockholders, was an expert in this field and was able to dispose of the grains as a matter of routine. Furthermore, petitioner had no facilities for storing the grains it received as crop share rents. These grains were stored in a local, independent warehouse which had issued to petitioner warehouse receipts evidencing petitioner's ownership of these grains. Petitioner's board of directors effected the purported dividend distributions by declaring a dividend in kind and directing its local agent to have the warehouse receipts reissued in the respective names of the stockholder-recipients.

Upon consideration of all the circumstances involved, it is clear that we have before us an attempt by a going concern to avoid the corporate income tax on the sale of its inventory by the annual ritual of a paper transfer of such inventory to its shareholders, followed closely by the sale of such inventory in the ordinary course. See *Meurer Steel Barrel Co.* v. *Commissioner*, 144 F. 2d 282, 284 (C.A. 3, 1944), certiorari denied 324 U.S. 860 (1944), rehearing denied 325 U.S. 892 (1944), affirming a Memorandum Opinion of this Court. Also cf. *Wichita Term. El. Co.* v. *Commissioner*, 162 F. 2d 513, 516 (C.A. 10, 1947), affirming 6 T.C. 1158 (1946), where the Court of Appeals stated:

Viewed rationally, the facts and circumstances as a whole reasonably lend themselves to the conclusion that from beginning to end the successive steps taken were merely integral parts of a unified operation having for its goal the sale and passing of title of the corporation through a conduit to the ultimate purchaser. We think the Tax Court acted within its authorized province in finding that for income tax purposes the sale and conveyance of the property was made on behalf of the corporation. * * *

Also cf. *Gensinger* v. *Commissioner*, 208 F. 2d 576, 578–579 (C.A. 9, 1953), reversing on this issue 18 T.C. 122 (1952).

We believe that the facts herein involved present an even stronger case than in *United States* v. *Lynch, supra,* for imputing to petitioner the amounts received by its stockholders upon their disposition of the grains "distributed" to them. The circumstances of the instant case differ from those in *Ripy Bros. Distillers, Inc.,* 11 T.C. 326 (1948), and *United States* v. *Cummins Distilleries Corporation,* 166 F. 2d 17 (C.A. 6, 1948), in that there was a finding of fact that no consensus or understanding existed between the stockholders and the corporation in the latter two cases that the assets distributed would be sold immediately upon distribution. *Ripy Bros. Distillers, Inc., supra* at 339; *United States* v. *Cummins Distilleries Corporation, supra* at 19, 21. Moreover, in those cases (1) the distributed assets could have been sold only by virtue of substantial negotiations, which were found to have been, in fact, conducted by the stockholders, and (2) the stockholder-distributees were found to have assumed real and substantial risks in connection with the disposition of the distributed assets.

Petitioner next contends that section 311(a) legislated the rationale of the *Lynch* case out of existence. We cannot accept this argument, especially in light of the following specific statement of the Senate Finance Committee qualifying the applicability of section 311:

Likewise your committee does not intend to change existing law with respect to attribution of income of shareholders to their corporation as exemplified for example in the case of *Commissioner* v. *First State Bank of Stratford* (168 F. 2d 1004, cert. den. 335 U.S.).

S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. 247 (1954). We do not believe that the failure by the Senate Finance Committee to specifically mention the *Lynch* case along with the *First State Bank* case affects the present validity of the *Lynch* rationale under section 311. See sec. 1.311–1(a), Income Tax Regs.

Petitioner's final argument with respect to the applicability of the *Lynch* rationale is that respondent abandoned this ground in his opening statement at the trial. It is true that counsel for the respondent did at one point in his opening statement make some remarks which, taken apart from the context of the record as a whole, might possibly suggest that respondent did abandon this ground.[16] However, upon a careful consideration of the entire record and such other factors as the demeanor and reactions of counsel for petitioner and respondent at the trial, the lack of a specific waiver of this ground by respondent, and the attention the *Lynch* doctrine received in the briefs of both petitioner and respondent, we cannot accept the contention that respondent did, in fact, waive or abandon this ground. An examination of the record indicates that at no time during the trial does it appear that counsel for petitioner understood respondent to be waiving the *Lynch* argument. In fact, most of the testimony of petitioner's first witness, who was introduced subsequent to respondent's opening statement, was directed toward the refutation of a *Lynch* type argument. Respondent's cross-examination of petitioner's first witness was directed to showing that pursuant to the regulations of the Department of Agriculture the grains purportedly distributed by petitioner to its stockholders could, in fact, have been sold or placed under CCC loan only by petitioner and not its stockholders. Petitioner is not claiming surprise with respect to the inclusion of a *Lynch* type argument by respondent on brief, for petitioner amply argued this issue on the merits in his opening and reply briefs. See *Boe* v. *Commissioner*, 307 F. 2d 339, 342 (C.A. 9, 1962), affirming 35 T.C. 720 (1961). We hold respondent did not abandon this argument.

---

[16] During the opening statement counsel for the respondent stated:

"Under Regulation 1.311–1(a) a sale is imputed to the corporation, or in the alternative, it is held [a] distribution by the corporation to the shareholders is, in effect, an anticipatory assignment of income. Those are the two exceptions to the general rule which says that distribution by a corporation to the shareholder is not income to the corporation. We are further limiting that and we are saying that this is an anticipatory assignment of the rent to the shareholders. This is the position of the government."

Because of our holding that net proceeds received upon the disposition of the "distributed" grains are imputable to the petitioner, we do not consider respondent's alternative ground that petitioner's yearly distribution of a portion of its crop share rents constituted an anticipatory assignment of income.

Finally, we must consider petitioner's argument that respondent assumed the burden of proof in this case because, in his opening statement at the trial, he asserted amended deficiencies based upon the inclusion, in petitioner's gross income in the years 1958 through 1961, of amounts equal to the net sums received by petitioner's stockholders upon their sale or hypothecation of the crops "distributed," rather than upon the inclusion of amounts equal to the net value of the crops at the date of their "distribution." Petitioner contends that respondent, by so amending the deficiencies, changed his ground and introduced new matter. We need not consider this question,[17] for respondent's assertion of amended deficiencies based upon increasing petitioner's gross income by the net amounts received by the stockholders upon the disposition of the "distributed" grains resulted in an increased deficiency for only 1 year, 1960. Thus, at least with respect to that year, the burden of proof falls upon the respondent. However, the result we have reached in this case is not based upon a failure of proof by petitioner. Moreover, respondent has come forward with sufficient evidence to meet the burden of proof upon him, and this Court has jurisdiction, pursuant to section 6214, to correct the amount of a deficiency, even though the amount so redetermined is greater than that specified in the notice of deficiency.

Respondent made a motion at the trial to conform the pleadings to the proof submitted so that the pleadings would reflect the amended deficiencies asserted by him. However, respondent has failed to file any amended pleading. See Rule 17 Tax Court Rules of Practice. Nevertheless, since a further amendment of the answer to correct the error would still be timely, *Commissioner* v. *Finley*, 265 F. 2d 885 (C.A. 10, 1959), affirming a Memorandum Opinion of this Court, certiorari denied 361 U.S. 834 (1959); and *Helvering* v. *Edison Securities Corporation*, 78 F. 2d 85 (C.A. 4, 1935), affirming in part and modifying 29 B.T.A. 483 (1933), we think it proper, in order to avoid delay, to accept the statements made by respondent at the

[17] The respondent in the notice of deficiency included certain additional amounts in petitioner's gross income in the years 1958 through 1961 on the ground that the proceeds from sales of crops by petitioner's stockholders were being attributed to the petitioner, and, in the alternative, the "distribution" of the crops by petitioner to its stockholders constituted an anticipatory assignment of income. These are the grounds or the theories which respondent proceeded upon, not only in the notice of deficiency, but also at the trial and upon brief. There was no element of surprise resulting from this adjustment made by respondent. Counsel for petitioner so stated at the trial. An examination of the record indicates petitioner understood that respondent was, pursuant to the grounds mentioned in the notice of deficiency, now computing the deficiencies on the basis of the net amounts received by petitioner's stockholders upon the disposition of the distributed crops, rather than on the basis of the net values of the crops at the date of distribution.

trial as an informal amendment to his answer. *William C. Baird*, 25 T.C. 387, 397–398 (1955).

*Decision will be entered under Rule 50.*