FREDERICK STEEL CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 92949.   Filed April 8, 1964.

*William R. Seaman* and *William K. Hoskins*, for the petitioner.
*Gerald W. Fuller*, for the respondent.

14

16

18

20

OPINION

Raum, *Judge:* 1. *Loss carry-over.*—Prior to July 14, 1954, petitioner was known as Cleveland Home Brewing Co.   It had sustained

heavy losses in the operation of its beer business which it discontinued early in 1952. It disposed of a considerable amount of its personal property in the spring of 1952 and continued to operate its ice business until about August of 1952 when that too was discontinued. Thereafter, throughout the remainder of 1952 and 1953, it does not appear to have engaged in any activity other than attempting unsuccessfully to make some sort of profitable use or disposition of the idle real estate remaining from the beer and ice business, and it incurred net losses during both of those years. The principal question before us is whether the net losses thus incurred, both prior to 1952 and up through 1953, may be used as carryovers in computing net operating loss deductions for 1954 and later years pursuant to section 122 of the 1939 Code and section 172 of the 1954 Code. The Government argue. that such carryovers are not available (a) by reason of section 269 of the 1954 Code dealing with acquisitions of corporate control made to evade or avoid income tax, and (b) because they are foreclosed by the so-called doctrine of *Libson Shops, Inc.* v. *Koehler*, 353 U.S. 382.

The evidence indicates a genuine business purpose in Byer's acquisition of the Cleveland Home Brewing Co. stock, and although he was aware of the corporation's net operating losses we cannot find on the record before us that he purchased the stock in order to take advantage of the losses. Rather, the evidence persuade us that Byer was interested primarily in making a "quick" and substantial profit on the transaction, which, contrary to expectations, did not materialize. Accordingly, we reject the Government's position based upon section 269. However, we agree that the deductions must be disallowed on the other ground.

The *Libson Shops* case and a number of decisions following it in a wide variety of situations have spelled out a requirement of continuity of business enterprise—that losses growing out of one business may not be carried forward to be applied in later years against income derived from an entirely different business. The Court in *Libson Shops* noted that the statutory provisions were enacted so as to allow a business to avoid the harsh consequences of taxing income on an annual basis; "[they were] designed to permit a taxpayer to set off its lean years against its lush years, and to strike something like an average taxable income computed over a period longer than one year." 353 U.S. at 388. Thus, if the business producing the income was not the same business which incurred the losses, it was not the "taxpayer" within the meaning of the statute. 353 U.S. at 388. *J. G. Dudley Co.*, 36 T.C. 1122, affirmed 298 F. 2d 750 (C.A. 4) ; *Commissioner* v. *Virginia Metal Products, Inc.*, 290 F. 2d 675 (C.A. 3), reversing 33 T.C. 788, certiorari denied 368 U.S. 889; *Huyler's*, 38 T.C. 773, affirmed 281 F. 2d 174 (C.A. 7) ; *Norden-Ketay Corporation* v. *Commissioner*, 319 F. 2d 902 (C.A. 2), affirming a Memorandum Opin-

ion of this Court; *Julius Garfinckel & Co.*, 40 T.C. 870; *Arthur T. Beckett*, 41 T.C. 386. Cf. *Mill Ridge Coal Co.* v. *Patterson*, 264 F. 2d 713 (C.A. 5); *Bookwalter* v. *Hutchens Metal Products, Inc.*, 281 F. 2d 174 (C.A. 8).

The tax years before us are 1954–57, and the only operating income realized by petitioner during those years was derived from its business as a finished steel jobber, a business which petitioner acquired in 1954 and which was entirely unrelated to the beer and ice business. The only other income of petitioner during the period 1954–57 was the $201,-055.74 profit upon its sale of the former Donal assets in 1954; these assets related to an electrical tool business theretofore carried on by another corporation and had no connection whatever with the beer and ice business. The rationale of the foregoing decisions requires us to hold that the pre-1954 losses which grew out of an entirely different enterprise may not be carried over in computing net operating loss deductions in the circumstances before use.

If the Frederick Steel Co. had been a wholly owned corporation of Byer instead of a division of American Compressed Steel, and if Byer had caused it to merge with petitioner, the case would be identical with or perhaps even weaker than *Libson Shops*. We cannot believe that Congress intended a different result merely because the finished steel jobbing business was a "division" of another wholly owned corporation of Byer which petitioner, a related taxpayer, acquired directly by "purchase" instead of by merger.

Petitioner has earnestly urged various factual distinctions upon us, but they do not go to the heart of the case. This issue must be decided against it.

2. *Capital gain.*—In May and June 1954 petitioner sold certain assets which it had acquired on or about April 22, 1954, upon liquidation of Donal, Inc., the stock of which it had in turn acquired from Byer on or about April 10, 1954. The parties have stipulated that petitioner realized a gain of $201,055.74 from these sales. The sole question in respect of this item is whether the assets sold were held for more than 6 months so that the profit may qualify as long-term capital gain.[1] The answer depends upon whether the holding period of these assets in the hands of Donal, conceded to be more than 6 months, may be added to the comparatively short period during which they were held by petitioner.

The April 22, 1954, liquidation of Donal was literally within the terms of section 112(b) (6) of the 1939 Code, which provides that "No

---

[1] Although it is true that petitioner reported the profit as "short-term" gain in its 1954 return, apparently this was a matter of no consequence to petitioner at that time in view of its position that the net operating losses of prior years could be used as carryovers and thus eliminate any tax for 1954. In view of our decision as to the unavailability of the carryovers, however, it now becomes important to determine whether the gain should be classified as long-term or short-term.

gain or loss shall be recognized upon the receipt by a corporation of property distributed in complete liquidation of another corporation." [2] And the basis of assets received in a section 112(b)(6) liquidation is "the same as it would be in the hands of the transferor." Sec. 113(a) (15). Accordingly, if the liquidation were governed by section 112(b)(6), the time during which the assets were held by Donal would have to be taken into account in determining the holding period, because section 1223(2) of the 1954 Code [3] specifically provides:

SEC. 1223. HOLDING PERIOD OF PROPERTY.
For purposes of this subtitle—

\*  \*  \*  \*  \*  \*  \*

(2) In determining the period for which the taxpayer has held property however acquired there shall be included the period for which such property was held by any other person, if under this chapter such property has, for the purpose of determining gain or loss from a sale or exchange, the same basis in whole or in part in his hands as it would have in the hands of such other person. [4]

The Government seeks to avoid the effect of these provisions by relying upon the so-called *Kimbell-Diamond* doctrine. *Kimbell Diamond Milling Co.*, 14 T.C. 74, affirmed 187 F. 2d 718 (C.A. 5), certiorari denied 342 U.S. 827. That case and its numerous progeny hold that where the stock of a corporation is purchased for the purpose of liquidating the corporation and obtaining its assets, the transaction is in substance merely a purchase of those assets and the statutory provisions dealing with nonrecognizable corporate liquidations are inapplicable. Cf., e.g., *United States* v. *M.O.J. Corporation*, 274 F. 2d 713 (C.A. 5); *Georgia-Pacific Corporation* v. *United States*, 264 F. 2d 161 (C.A. 5); *H. B. Snively*, 19 T.C. 850, affirmed 219 F. 2d 266 (C.A. 5); *North American Service Co.*, 33 T.C. 677; *Orr Mills*, 30 T.C. 150; *Estate of James F. Suter*, 29 T.C. 244; *Montana-Dakota Utilities Co.*, 25 T.C. 408.

However, the rule applied in these cases has its limitations. *John Simmons*, 25 T.C. 635, 641–642; *Long Island Water Corporation*, 36 T.C. 377, 389–390. In commenting upon situations in which the *Kimbell-Diamond* rule has been deemed inapplicable, the Court in *North American Service Co.*, 33 T.C. 677, stated (p. 692):

---

[2] Like provisions are contained in sec. 332 of the 1954 Code, but sec. 392 of the 1954 Code states that except as otherwise provided, part II, dealing with corporate liquidations, shall apply only where the first distribution in liquidation occurs on or after June 22, 1954.

[3] Except as otherwise provided, the 1954 Code applies to taxable years beginning after Dec. 31, 1953, sec. 7851, and there are no provisions which provide "otherwise" in respect of the holding period involved herein.

[4] Sec. 1223(9) provides:

(9) Any reference in this section to a provision of this title shall, where applicable, be deemed a reference to the corresponding provision of the Internal Revenue Code of 1939, or prior internal revenue laws.

the facts disclose that there was a significant relationship between the interests who controlled and operated the acquired corporation and the interests who controlled and operated the acquiring corporation, a continuity of interest entirely absent from the instant case.

Again, in announcing its acquiescence in *United States* v. *M.O.J. Corporation*, 274 F. 2d 713, the Internal Revenue Service was careful to note (1960–2 C.B. 462) :

> The acquisition of assets through the purchase-liquidation method in the instant case was by a corporation *owned by an entirely different group of stockholders* from the group which owned the acquired corporations. [Italics supplied.]

The present case is certainly not the typical one for application of the *Kimbell-Diamond* rule. This is not a situation where petitioner, unable to buy desired assets of a corporation, purchased the stock of the corporation and liquidated it. Both petitioner and Donal were controlled by Byer at the time of the transaction and for about several years prior thereto. The distinction noted in the acquiescence in the *M.O.J.* case is present here. The assets in question had been under common control for a substantial period of time, and indeed the evidence reveals that the very gain on sale that is here involved was measured from the basis of the assets in the hands of Donal. For, as our findings disclose, by far the greatest component of that gain was attributable to reduction in basis of the assets through depreciation, and depreciation in such large amounts could have occurred only during the comparatively long period that such assets were held by Donal.

In view of the particular circumstances in this case, we hold that the provisions of sections 112(b) (6) and 113(a) (15) of the 1939 Code and section 1223(2) of the 1954 Code, which apply literally here, are not rendered inapplicable by the *Kimbell-Diamond* rule. Petitioner is entitled to compute the holding period of the assets in question by taking into account the period during which they were held by Donal, and the capital gain in question must therefore be classified as long term.

3. *"Commissions" to purchasing agent of American Can.*—American Can Co. was petitioner's largest customer, and petitioner had an arrangement with one of American Can's employees, its purchasing agent, whereby petitioner would pay "commissions" to this person in an amount equal to approximately 2 percent of petitioner's sales to American Can. Thus, it paid him $4,916.37 in 1957 and $4,010.12 in 1958. The sole question presented in respect of this item is whether such payments were "ordinary and necessary" business expenses under section 162(a) of the 1954 Code.

Whether the payments were both ordinary and necessary is a question upon which petitioner has the burden of proof. *Welch* v. *Helvering*, 290 U.S. 111, 115. Assuming that petitioner's payments were "necessary," we are satisfied that petitioner has failed to meet its

burden of proving that the payments were "ordinary." The word "ordinary" means normal, usual, or customary; consequently, the payments in issue must be of the type which are common to, or frequently occur in, the type of business in which petitioner is engaged. *Deputy* v. *Dupont*, 308 U.S. 488, 495; cf. *Welch* v. *Helvering*, 290 U.S. at 114.

The payments which petitioner euphemistically described as "commissions" were not in reality commissions; rather, they appear to be of the type more commonly referred to as graft or commercial bribes. To prevail on this issue petitioner has the burden of proving that it was the normal, usual, or customary practice for finished steel jobbers such as petitioner to make payments of this nature to purchasing agents of their customers. The only evidence with respect to this matter was testimony by petitioner's owner, Abe Byer, who, when asked if he knew of "any other similar arrangements in the industry," replied: "Yes, sir; lots of such arrangements are made in the industry."

We heard that testimony and the short answer is that we have no confidence in it. There is no convincing evidence whatever that Byer was in fact familiar with any other similar arrangements or practice in the industry, and he appeared only too ready to give a broad, sweeping answer that did not ring true. Such self-serving, unconvincing testimony falls far short of establishing that payments in the nature of commercial bribes were common in this segment of the steel industry.

This case is to be sharply distinguished from *Lilly* v. *Commissioner*, 343 U.S. 90, relied on by petitioner, where the Court concluded that the payments were "ordinary." The Court stated, at page 93, that the facts were "not in dispute" and that under the "long-established practice in the optical industry in the localities where petitioner did business, [the payments] * * * were normal, usual and customary in size and character. The transactions from which they arose were of common or frequent occurrence in the type of business involved. They reflected a nationwide practice." [5] We cannot make any such a finding in this case. The payments herein were not deductible. Cf. *United Draperies, Inc.*, 41 T.C. 457.

Because of our disposition of this issue, we need not decide whether the payments frustrated sharply defined national or State policies within the meaning of such cases as *Tank Truck Rentals, Inc.* v. *Commissioner*, 356 U.S. 30; *Commissioner* v. *Heininger*, 320 U.S. 467, 473; *Dixie Machine Welding & Metal Works, Inc.* v. *United States*, 315 F. 2d 439 (C.A. 5), certiorari denied 373 U.S. 950, and *Boyle, Flagg & Seaman, Inc.*, 25 T.C. 43.

*Decision will be entered under Rule 50.*

---

[5] In *Frank J. Valetti*, 28 T.C. 692, reversed on other grounds 260 F. 2d 185 (C.A. 3); *Kirtz* v. *United States*, 304 F. 2d 460 (Ct. Cl.); and *Fiambolis* v. *United States*, 152 F. Supp. 10 (E.D. S.C.), there were findings that the payments involved were customary, or reflected common practice. Such payments were therefore "ordinary."