LAKESIDE GARDEN DEVELOPERS, INC., ET AL, 1 Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Lakeside Garden Developers, Inc. v. CommissionerDocket Nos. 6035-73, 6034-73.United States Tax CourtT.C. Memo 1976-290; 1976 Tax Ct. Memo LEXIS 113; 35 T.C.M. (CCH) 1294; T.C.M. (RIA) 760290; September 13, 1976, Filed *113 The individual taxpayers organized a corporation to develop an apartment complex for sale as condominiums. A part of the land was set aside for recreational facilities. Upon completion of the first building, the recreational facilities were sold to the individual stockholders at cost, and leased back under a 99-year lease by the condominium association. At that time, the developer still owned all of the apartments and was, in fact, the condominium association. As the apartments were sold to the individual purchasers, each assumed a proportionate share of the obligations under the 99-year lease. Respondent determined that the present value of the obligation to pay rentals under the 99-year lease, to the extent that such rentals exceeded a fair rental value for the recreational facilities, constituted a part of the consideration received by the developer for the sale of the condominiums and was taxable as such. Held: Although respondent might have been justified in taking corrective action on account of the transactions between the developer and its stockholders, there is no basis in law for capitalizing the value of any excess rentals and charging such amount to the developer*114 as income in the year that the obligation under the recreation lease was assumed by the purchasers of the individual condominiums. Robert O. Rogers, for the petitioners. Curtis O. Liles, III, for the respondent. QUEALYMEMORANDUM FINDINGS OF FACT AND OPINION QUEALY, Judge: Respondent determined deficiencies in the income tax of petitioners in the following amounts: Kenneth A. Murry and Helen J. Murry - Docket No. 6034-73 Year EndedDeficiency § 6651(a) § 6653(a)12/31/66$27,924.5612/31/6741,217.8412/31/6855,090.85 Lakeside Garden Developers, Inc. - Docket No. 6035-73 6/30/66$54,009.606/30/6798,252.276/30/6879,556.65$19,889.16$3,977.836/30/6923,863.605,965.901,193.18As a result of the agreement by the parties, the sole issue to be considered for decision at this time is whether Lakeside Garden Developers, Inc., realized additional income under section 612 from the sale of condominium residential units represented by the obligation, which the purchasers of those units were required to assume, to pay rentals*116 under a 99-year lease for so-called recreational facilities which had been erected by Lakeside Garden Developers, Inc., and transferred to its stockholders. Depending upon the decision of the Court with respect to that issue, a further hearing may be necessary to determine the nature and amount of such income and the extent to which taxable to the shareholders of Lakeside Garden Developers, Inc. FINDINGS OF FACT Some of the facts have been stipulated. Such stipulations and the exhibits attached thereto are incorporated herein by this reference. During the taxable years in question, Kenneth A. Murry and Helen J. Murry were husband and wife having their principal place of residence at 2200 Lake Drive, Delray Beach, Florida. They filed a joint individual Federal income tax return, Form 1040, for each of the calendar years 1966, 1967 and 1968, with the Southeast Service Center of the Internal Revenue Service at Chamblee, Georgia. During the taxable years in question, Lakeside Garden Developers, Inc., hereinafter called Lakeside, was a corporation having its principal place*117 of business at 7340 South Military Trail, Lake Worth, Florida. For each of the fiscal years ending June 30, 1966, through June 30, 1969, it filed a United States corporation income tax return, Form 1120, with the Southeast Service Center of the Internal Revenue Service at Chamblee, Georgia.Mr. Kenneth A. Murry had extensive experience in the construction industry. He entered into an agreement with Mr. Elias Breath and Mr. Harry W. Topal, who were to contribute the necessary capital to organize a corporation and to build and to sell condominium apartments. Pursuant to such agreement, on April 22, 1965, they caused Lakeside to be incorporated. Pursuant to the articles of incorporation, there were authorized 100 shares of common stock, of which 45 shares were issued to Kenneth A. Murry, 45 shares were issued to Elias Breath, and 10 shares were issued to Harry W. Topal. In January 1966, Harry W. Topal died and 5 of his shares were purchased by Mr. Murry and the other 5 shares were purchased by Mr. Breath, whereupon each became the owner of 50 shares of the 100 authorized and outstanding shares of Lakeside. On May 22, 1965, Mr. Murry entered into a contract to acquire a parcel*118 of land on which Lakeside was to construct the apartments. After a mortgage commitment was obtained, Lakeside took title to the land. The development plan contemplated the construction of 11 apartment buildings, to be sold as condominiums, clustered around a common recreational facility. It was further contemplated that the recreation facility would be held by the stockholders of Lakeside and leased to the condominiums under a 99-year lease, with all maintenance and other expenses incident thereto to be paid as a part of the condominium expenses. In other words, the owners of the recreation facilities would lease such facilities to the condominium owners under a 99-year net lease at a specified rent. The complex was to be known as "Lakeside Point Gardens." The first condominium apartment building was nearing completion in January 1966. At a special meeting of its board of directors held on January 19, 1966, Lakeside was authorized to convey to Mr. Murry and Mr. Breath the specific real property on which the recreational facilities were being constructed. On January 27, 1966, Lakeside conveyed such property for a stated consideration of $6,000, receiving two notes in the amount*119 of $3,000, one of which was executed by Mr. Murry and the other by Mr. Breath. At the same time, Mr. Murry and Mr. Breath each gave a note to Lakeside for one-half of the cost of the improvements on said properties, amounting to a total of $62,213.61, dated November 14, 1966. On January 27, 1966, Lakeside also submitted a declaration of condominium for the first condominium building which was nearing completion. Simultaneously, Mr. Murry and Mr. Breath, individually, entered into a 99-year lease with the condominium owners association for this building whereby that association acquired a nonexclusive right to use the recreational facilities in exchange for a stated rental. The condominium owners association was comprised of the owners of all the units in the apartment building. At the time the 99-year lease was entered into, the owner of such units was Lakeside. Periodically through the next three calendar years, each of the other ten condominium apartment buildings at the Lakeside Point Gardens complex, together with the land on which it was situated, was submitted to condominium ownership. Simultaneously with the submission of each building to condominium ownership, the*120 condominium owners association for each building (Lakeside) entered into a long-term lease with Mr. Murry and Mr. Breath, giving that association a nonexclusive right to use recreation facilities in exchange for a stated payment. Each lease provides, in part, as follows: 24. LESSEE DOES NOT HAVE EXCLUSIVE RIGHT OF POSSESSION. This lease does not grant to the Lessee the exclusive right of possession to the demised premises. The Lessee understands and agrees that the Lessor shall have the right to make and enter into similar lease arrangements with others, including corporations or apartment house projects under the condominium or cooperative format, and said Lessee will have equal rights to the possession, use and occupancy of the demised premises and each and every part thereof. Notwithstanding the fact that the Lessor may contract with other lessees for the possession, use and occupancy of the demised premises, as above set forth, the obligation to pay the rent in the sum provided and specified hereinabove in this lease and any of the other obligations due and to become due hereunder shall continue as the sole obligation of the Lessee herein, its successors and assigns, without*121 diminution, reduction or abatement because of the leasing to other lessees of the demised premises, or for any cause or reason whatsoever, and the liability for the payment of rent and any of the other obligations due and to become due hereunder may not be avoided by waiver of the use, enjoyment or abandonment of the leased premises or any part thereof. The members of each condominium owners association were the owners of the condominium apartment units to which that association related. At the time each 99-year recreation lease was executed, Lakeside owned all of the units. Mr. Murry and Mr. Breath constituted two of the first three directors of each condominium owners association. Additionally, Mr. Murry was president of each association and Mr. Breath was vice-president and secretary-treasurer. For the fiscal years ending June 30, 1966, through June 30, 1969, Lakeside was engaged in selling condominium units at the Lakeside Point Gardens complex. As part of the sale of an individual unit, the purchaser was required to execute a retail purchase agreement for the purchase of his condominium unit. In purchasing an individual unit, the purchaser acquired an interest in a*122 proportionate part of the real property on which the condominium building was constructed. To purchase a condominium unit at the Lakeside Point Gardens complex, the purchaser was required to pay a stated sales price for the unit as well as assume certain obligations under the declaration of condominium for the particular building in which the purchaser was purchasing a unit, including an obligation for a proportionate share of the 99-year recreation lease which the condominium owners association for that particular building had entered into with Mr. Murry and Mr. Breath. These obligations were set forth in the purchase agreement. No one could purchase a condominium unit at the Lakeside Point Gardens development without assuming these obligations. The recreation area leased by the condominium owners association under the 99-year recreation lease was part of the common elements of the Lakeside Point Gardens development. The maintenance and operation of the common elements, including the recreation facilities, was the responsibility of the condominium owners associations and was a common expense. The common expenses included the expense of administration, maintenance, operation, *123 repair and replacement of the common elements including the premises leased by the condominium owners association under the 99-year recreation lease. A purchaser of the condominium unit at Lakeside Point Gardens agreed to be bound by the declaration of condominium and the 99-year recreation lease. As such, he agreed to be liable for his proportionate share of the common expenses including his proportionate share of the maintenance of the recreation area and the rent due under the 99-year recreation lease. Messrs. Murry and Breath, as lessors, had a lien on the interest of the condominium owners association as lessee. The condominium owners association also had a lien on each condominium apartment for any unpaid assessments and a lien on all tangible personal property located within the apartments, including the amount advanced on behalf of an apartment owner in payment of his obligation under the long-term lease. The average stated sales price per residential unit sold by Lakeside for the fiscal years ending June 30, 1966, through June 30, 1969, was as follows: 6-30-66$ 9,993.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,351.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,816.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,510.67For the four years*124 before the Court, Lakeside had a net operating loss from the sale of condominium units, without consideration of the recreation leases, of $17,279.91. Pursuant to the recreation lease, the monthly rentals allocable to each unit in the apartment complex ranged from $15.00 to $24.00. The annual recreational lease rentals from the 11 apartment buildings in the complex totaled $65,280.00. OPINION In these cases, the individual taxpayers proposed to acquire a tract of land for development as condominium apartment buildings. Lakeside was formed to act as developer. Kenneth A. Murry thereupon entered into an agreement to buy the land on behalf of Lakeside. Upon obtaining a commitment for a construction loan, Mr. Murry then transferred the land to Lakeside. Under Mr. Murry's direction, Lakeside proceeded with the construction of 11 condominium apartment buildings, clustered around a so-called "recreational facility." When the first apartment building was near completion, Lakeside conveyed the "recreational facility," which comprised a portion of the land and the improvements thereon, to Mr. Murry and his associate (the sole stockholders of Lakeside) at cost. Lakeside then submitted*125 the building to condominium ownership, forming a condominium owners association in which Lakeside, as then owner of all the apartments, was the sole member. The association then entered into an agreement to lease the recreational facilities for a period of 99 years at a stated rental. As each of the remaining buildings were completed and submitted to condominium ownership, Lakeside would enter into an identical lease for the common recreational facilities. When the condominium apartments were sold by Lakeside to the individual owners, each was required to assume, as part of the common charges to the apartment owner, the obligation to pay an allocable share of the amount due under the 99-year leases on account of the recreational facilities. The obligation constituted a lien enforceable against the interest of the owner of the apartment. The respondent has determined that Lakeside realized income upon the sale of each apartment or unit in the condominium complex measured by the difference between the allocable cost of the unit to Lakeside and the consideration received by Lakeside for the sale of such apartment, including the present value of obligation assumed by the purchaser*126 to pay a rental under the 99-year lease of the recreational facility to the extent that such rental was "excessive." 3 By "excessive" the respondent means the amount by which the rentals for the recreational facilities exceeded a "fair rental" for such facilities, which the respondent determined to be 10 percent of the cost of the facilities. The respondent would treat the present value of the obligation of the ultimate purchasers to pay "excessive rentals" over the 99-year term, as income to Lakeside in the first instance, and as a dividend to its stockholders. Cf. Southern Ford Tractor Corporation,29 T.C. 833 (1958); Fontana Power Co. v. Commissioner,127 F.2d 193 (9th Cir. 1942). *127 Petitioner argues that the rental which the individual condominium purchasers assumed was paid pursuant to a 99-year lease of the recreational facilities and, as such, cannot be attributed to Lakeside as a part of the purchase price of the condominium. While it must be assumed for the purposes of this decision that the rentals were excessive in relation to the cost of the recreational facilities, petitioner contends that the amounts paid nonetheless constituted rent, chargeable solely to the owners of the recreational facilities, citing Welsh Homes, Inc.,32 T.C. 239 (1959), affd. 279 F.2d 391 (4th Cir. 1960); Estate of Ralph W. Simmers,23 T.C. 869 (1955), affd. 231 F.2d 909 (4th Cir. 1956); Morris Lipsitz,21 T.C. 917, 936 (1954), affd. 220 F.2d 871 (4th Cir. 1955). For purposes of this decision, the parties have agreed that there was a preconceived plan whereby the individual condominium units to be sold by Lakeside would first be burdened with an obligation to pay excessive rentals to the stockholders of Lakeside on account of the 99-year lease of the recreational facilities,*128 in order to provide the stockholders of Lakeside with a continuing income in the form of rents. Such transactions between a corporation and its sole stockholders need not be given effect for tax purposes. Green v. United States,460 F.2d 412 (5th Cir. 1972); Riss v. Commissioner,478 F.2d 1160 (8th Cir. 1973), affg. 56 T.C. 388 (1971); Waldheim v. Commissioner,244 F.2d 1 (7th Cir. 1957), affg. 25 T.C. 839 (1956); 58th St. Plaza Theatre, Inc. v. Commissioner,195 F.2d 724 (2nd Cir. 1952), affg. 16 T.C. 469 (1951). The Court thus would sustain the right of the respondent to look to the substance of the transactions involved in this proceeding for purposes of determining the resulting tax liabilities of the parties. Cf. e.g., Smith v. Commissioner, F.2d , (8th Cir. July 9, 1976); Waterman Steamship Corporation v. Commissioner,430 F.2d 1185 (5th Cir. 1970), cert. denied 401 U.S. 939; United States v. General Geophysical Company,296 F.2d 86 (5th Cir. 1961); see also National Carbide Corp. v. Commissioner,336 U.S. 422 (1949).*129 In so doing, the respondent was presented with several possible courses of action.Respondent could have determined that the recreational facilities coupled with the 99-year lease, which Lakeside as sole owner of the apartments entered into contemporaneously with the sale of the recreational facilities to its stockholders, gave rise to a "bargain sale" and a resulting distribution by the corporation to its stockholders at that time. Cf. Palmer v. Commissioner,302 U.S. 63 (1937); Riss v. Commissioner,supra;Green v. United States,supra;Waldheim v. Commissioner,supra. However, the parties have disaffirmed any intention to raise that issue. In the alternative, the respondent could have determined that the sale of the recreational facilities by Lakeside to its stockholders, accompanied by a lease-back of those facilities for an excessive rental resulted in the payment of dividends in the form of excessive rents. Cf. Southern Ford Tractor Corporation,supra.When the individual purchaser of the condominium assumed the obligation of Lakeside, the owner of the apartments when the 99-year*130 lease was made, to pay such "dividends," the rentals thus paid would be taxable to Lakeside in the first instance. See United States v. Joliet & Chicago R. Co.,315 U.S. 44 (1942); A.B.C.D. Lands, Inc.,41 T.C. 840 (1964). Lakeside would, in turn, be permitted to deduct a reasonable rental and any excess would be treated as a dividend. 58th St. Plaza Theatre, Inc.v. Commissioner,supra;Limericks, Inc.,165 F.2d 483 (5th Cir. 1948), affg. 7 T.C. 1129 (1946). Both in his notice of deficiency and in the presentation of the case to the Court, respondent has not sought to assert either of the aforementioned alternatives. For that reason, the Court is not called upon to consider such characterizations of these transactions for tax purposes. Regardless of the merits of those alternatives, we find no basis in the law for the corrective action sought here by the respondent.Respondent would treat the present value of the obligation, assumed by the ultimate purchaser of these condominium units to pay so much of the rents for the recreational facilities, which may be considered "excessive," as*131 part of the consideration received by Lakeside from the sale of such units. Respondent argues that this characterization of the facts represents the substance of the transaction for tax purposes. Respondent points out that the purchasers of the individual condominium units were not in a position to negotiate with respect to the rentals to be paid for the recreational facilities. Hence, there was no "arms-length" negotiation to fix the amount of such rentals. While this may be correct, it must also be recognized that these particular units were not the only condominiums available for purchase in the Fort Lauderdale area. If the purchasers were not willing to rent recreational facilities, they could have purchased other condominiums which were not burdened with recreational leases. Furthermore, the so-called "excessive rentals" resulted from the fact that the 11 buildings were completed and sold out. It may well be from the standpoint of the individual purchasers the monthly charge was a reasonable fee for the use of the facilities.It is not uncommon for developers to incur costs for*132 other land and improvements such as water and sewage systems, roadways, recreation areas and the like for the benefit of the development as a whole. Where the developer either dedicates such facilities for general use or transfers such facilities to the purchasers of the individual properties within the development for the purpose of inducing customers to buy such properties, such expenditures become a part of the cost of the properties to be sold. On the other hand, where the developer does not dedicate such facilities to the exclusive use of the property owners, but instead elects to make the facilities a commercial venture in and of itself, the cost of the facilities does not become a part of the basis of each property sold. Willow Terrace Development Co. v. Commissioner,345 F.2d 933 (5th Cir. 1965); Gersten v. Commissioner,267 F.2d 195 (9th Cir. 1959); Milton J. Noell,66 T.C. 718 (1976); DerbyHeights, Inc.,48 T.C. 900 (1967); Colony, Inc.,26 T.C. 30 (1956), affd. on other issues, 244 F.2d 75 (6th Cir. 1957); Country Club Estates, Inc.,22 T.C. 1283 (1954).*133 While the recreational facilities in this case may have been constructed, in part, for the purpose of inducing customers to purchase condominium units, the lessor of these facilities retained complete control over their future use and development. Under paragraph 24 of the longterm "lease" between the condominium association and the owners of the recreational facilities, the owners merely gave the association a nonexclusive right of possession. The owners specifically reserved the right to make and enter similar lease arrangements with any "others." 4By virtue of the complete control which the owner of these recreational properties reserved over their future use and development, the rights retained by the lessor would have*134 precluded inclusion of the cost of such facilities in the basis of the condominium units. Since the cost of the recreational facilities could not be considered a part of the cost of the project, the cost of these facilities would not have been recoverable, for tax purposes, from the sale of the condominium units. Cf. Frank B. Cooper,31 T.C. 1155 (1959).To include the present value of the excessive rentals from these facilities as a part of the proceeds of the sale of the condominium units would thus be contrary to the rationale of Willow Terrace Development Co. v. Commissioner,supra;Gersten v. Commissioner,supra;Milton J. Noell,supra;Derby Heights, Inc.,supra; Colony, Inc.,supra;Country Club Estates, Inc.,supra and similar cases. The position of the respondent in this case is bottomed on the proposition that the obligation to pay "excessive rentals" had a present value and that such value was taxable to Lakeside as a part of the proceeds of the sale of the individual units. The mere fact that the obligation has a present "value" does not warrant the adoption of this theory. *135 There is little question that the obligation of any lessee to pay rent under a 99-year lease has a present value. But to attempt to tax the value of such a leasehold at the time that the lease is entered into, or when such obligation is assumed by a third party, would run directly counter to what has been the accepted practice, and presumably the law, since the first revenue act. Welsh Homes, Inc.,supra;Estate of Ralph W. Simmers,supra;Morris Lipsitz,supra.In the alternative, the respondent contends that the "value" of the obligation to pay the "excessive rentals" as of the date that such obligation was assumed by the individual purchasers of the condominium units should be allocated to Lakeside pursuant to section 482. If such "value" does not constitute income in the first instance, there is nothing to allocate. For the reasons stated herein, and solely on the basis upon which the proceeding was submitted to the Court, Decisions will be entered for the petitioners. Footnotes1. The cases of the following petitioners are consolidated herewith: Kenneth A. Murry and Helen J. Murry, docket No. 6034-73; Mary B. Breath, docket No. 5576-72; Estate of Elias Breath, Nathaniel Breath and Laurence R. Martin, Co-executors, docket No. 5577-72; and Estate of Elias Breath, Deceased, Lawrence R. Martin and Nathaniel Breath, Co-executors, docket No. 7646-73. A settlement was reached in the latter three cases, leaving for decision the captioned case and the case of Kenneth A. Murry and Helen J. Murry, docket No. 6034-73.↩2. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954.↩3. In his brief, the respondent's position is summarized as follows: Section 61 of the Internal Revenue Code of 1954 (hereinafter referred to as Code) provides that a taxpayer is required to include in gross income gains derived from dealings in property.The amount of gain is the difference between the amount realized and the adjusted basis in the property sold. Code § 1001(a); Treas. Reg. §§ 1.61-6(a), 1.1001-1(a). The amount realized is the sum of any money received plus the fair-market value of any property other than money received. Code↩ § 1001(b). This case involves the question of other property received on the sale of condominium units.4. There was no "lease" in the strict sense.When each condominium association undertook its obligation to pay its share of the rent under the so-called 99-year lease, and each individual purchaser assumed his pro rata share of that obligation, all he acquired was the privilege of sharing in the maintenance and use of the recreational facilities. This privilege is more analogous to a membership in a private club than ownership of a leasehold interest.↩