Patrick H. Smith and Julia Smith v. Commissioner.
Smith v. Commissioner
Docket No. 94209.
United States Tax Court
T.C. Memo 1964-274; 1964 Tax Ct. Memo LEXIS 66; 23 T.C.M. (CCH) 1661; T.C.M. (RIA) 64274; October 20, 1964
David Joseph, 17 E. 49th St., New York, N. Y., and Jerome Landau, for the petitioners. Eugene L. Wilpon and Robert D. Whoriskey, for the respondent. RAUM
Memorandum Findings of Fact and Opinion Respondent determined the following deficiencies in income tax and additions to tax: Additions to Tax.
I.R.C. 1939
Year
Deficiency
Sec. 293(b)
Sec. 294(d)(2)
1947
$ 475.00
$ 237.50
1948
1,308.52
654.26
$ 78.42
1949
2,095.64
1,047.82
138.05
1950
20,588.46
10,294.23
1951
13,529.60
6,764.80
844.20
1952
7,887.76
3,943.88
The principal issue is whether petitioners' 1947-1952 income tax returns were fraudulent with intent to evade tax. Findings of Fact Some of the facts are stipulated, and, as stipulated, *67 are incorporated herein by reference. Petitioners, husband and wife, are residents of New York City. They filed joint income tax returns for the years 1947 to 1952, inclusive, with the district director of internal revenue, Upper Manhattan, New York. Julia Smith is a party to this proceeding only by reason of having filed joint returns with her husband, Patrick H. Smith, hereinafter sometimes referred to as Smith. The returns of petitioners for the years 1947 through 1952 were filed within the time prescribed by Section 53(a) of the Internal Revenue Code of 1939. The notice of deficiency for those years was issued by the respondent on June 12, 1961. Petitioners' income tax returns for the taxable years 1947 through 1952 were prepared by the accounting firm of David Joseph & Co. Their returns for the years 1947 through 1951 were prepared by Irving Finkstein of David Joseph & Co. under the supervision of David Joseph, and their 1952 return was personally prepared by David Joseph. Smith was born in New York City in 1887, and his schooling ceased after the seventh grade of elementary school. The Piership Protective Corporation (hereinafter referred to as Piership) was organized *68 in 1941. It engaged in the business of supplying watchmen and guards on piers in and around New York City. During the taxable years it had an annual volume of business of approximately $700,000. John T. Clark & Son (hereinafter referred to as Clark), a related corporation, was in the business of loading and unloading ships on piers in and around New York City and employed stevedores. During the taxable years it had an annual volume of business of approximately $7,000,000. Smith was one of the principals in both corporations and either he or a member of his family had a 20 percent stock interest in each of them. Piership and Clark performed their services principally on the piers of Manhattan, Brooklyn, and Hoboken. During the taxable years and prior thereto David Joseph & Co. performed accounting services for both Piership and Clark. During the taxable years Smith performed services for both Piership and Clark on the waterfront, and he treated them as though they were one enterprise. He spent most of his time on the piers; it was his job to see to it that there was an adequate supply of labor, and to expedite the various guarding, and loading and unloading operations engaged in *69 by the companies. He was on the piers every day, and sometimes at night when there was a ship sailing on which the companies had services to perform. During the Korean War years (June 1950 to July 1953) the companies were often asked to unload a ship quickly and it was Smith's job to see to it that there was an available supply of labor for these "quick turnarounds". During the course of a week Smith frequently visited as many as 25 piers. In their income tax returns for the years 1947 through 1952 petitioners reported the receipt by Smith from Piership and Clark of the following salaries: Year
Piership
Clark
1947
$5,000.04
$15,000.00
1948
2,500.02
17,499.98
1949
20,000.00
1950
20,000.04
1951
2,500.00
20,000.00
1952
5,000.04
20,208.38
Piership and Clark shared the same offices at 17 State Street, New York City. Piership also had an office at pier 92. Prior to 1949, Stanley Oliver was the office manager, head bookkeeper and accountant. After he died in 1949 Herbert E. Balbach became office manager and Eleanor McCarthy became the supervisor of the bookkeeping department and was made assistant treasurer of Piership for the purpose of signing *70 checks. She was also an officer of Clark, was authorized to sign checks for that company, and received her salary from Clark. Grace McMahon was the bookkeeper for Piership, and Loretta Connolly the bookkeeper for Clark. As supervisor of the bookkeeping department Eleanor McCarthy saw to it that they kept the books posted up-to-date and prepared trial balances. She did not check the entries made by Grace McMahon on Piership's books or give her any advice on keeping those books. When Grace McMahon had any bookkeeping problems she took them up with Finkstein. Before making any entry in the books of Piership, other than routine entries in the cash book, she received a journal entry or petty cash slip from an officer of the company authorizing her to make the entry. Henry Filippone was the dispatcher for Piership and the supervisor of its office at Pier 92. The preparation of payrolls and drafts of invoices to customers was done at that office. Piership had many customers. Its principal customers were United Fruit Company and the Cunard Steamship Company. Invoices sent to United Fruit were based on tour slips. They were filled out and signed by the officer in charge of the ship when it *71 was ready to sail and showed the name of the ship, the month and the days it was at the pier, and the number of guards who reported and worked an eight-hour shift or "Tour". Drafts of invoices were based upon the tour slips. Filippone kept a record in a "little book" of the arrival and sailing date of, and the number of men who worked on, every ship. Some of the United Fruit ships docked at piers in Hoboken or at the Bethlehem Steel or Todd's shipyard and not at piers of United Fruit on the North River. Once a month during the years 1947 through 1952 Filippone prepared a memorandum showing the names of these United Fruit "outside ships", the number of men who worked on each of them during the month, and what the total billing to United Fruit would be on those outside ships for that month. During the period Stanley Oliver was office manager the monthly memorandum was sent to him, and when he left Piership in 1949 it was sent to Eleanor McCarthy. Filippone did not receive any instructions or directions from Smith with respect to tour slips, invoices, and any of the records he kept, or the monthly memorandum he sent to Oliver or Eleanor McCarthy. When Eleanor McCarthy received the monthly *72 memorandum from Filippone she would look at the total shown thereon, and make a computation to determine 20 percent of that total. Then she would insert that 20 percent figure in a form for a journal entry which she prepared on a slip of paper for the month to which it applied, show it to Smith, and he would initial it. After this was done she would then give the slip to Grace McMahon who would make the journal entry on Piership's books. The following journal entry is typical of those made each month during the taxable years which were posted by Grace McMahon to the general ledger of Piership: Commission: United Fruit $520.16 To Commission Suspense: United Fruit $520.16 As per slip 6/5/51. The account "Commission: United Fruit" was a general ledger expense account, and the account "Commission Suspense: United Fruit" was a general ledger liability account. When Grace McMahon started to work for Piership in July 1945 there was a suspense account on its books but the words "Commission: United Fruit" did not appear in the title. That suspense account then included the so-called United Fruit commission account and other items. In 1946 Grace McMahon suggested to Stanley Oliver *73 that the United Fruit account be separated from this account and set up as a separate account and she received his permission to do this. The change was entirely her idea and she decided to label the new accounts "Commission: United Fruit" and "Suspense: Commission etc. United Fruit". These labels were false. The accounts had nothing to do with any United Fruit commissions. In 1944, when the United Fruit commission account first came to the attention of Finkstein, he made some inquiries as to the purpose of the account. Oliver, who was then office manager, told him it was an expense account, and Dan McKetrick, who was then an officer of Piership, told him that Piership was not making much money and they were watching its expenses; that the moneys charged to this account were moneys that were being set aside each month toward expenses; and that from time to time they would withdraw against those moneys a sum of $1,000 to distribute with respect to those expenses. McKetrick also told David Joseph, prior to 1950, that they were setting aside moneys in the account toward expenses. During one of his monthly visits to the State Street office during the taxable years, Finkstein asked *74 Smith about the "Commission Suspense: United Fruit" account, and was told by Smith "that it was for certain expenses they incurred". Finkstein then asked Smith, "Do you know it is being charged to commissions", and Smith said: "If you want to charge it to commissions O. K." Finkstein also told Smith that there might be some question about this account when the Bureau of Internal Revenue examined it, and Smith said: "When the time comes I will answer for it." Approximately every second or third month Smith would ask Eleanor McCarthy how the account stood or what was the balance in the account, and she knew that he was referring to the "Commission Suspense: United Fruit" account. She would tell him what the balance was, and he would frequently ask for a check in the amount of $1,000. She would then ask Grace McMahon to make out a check on the Piership bank account payable to cash for this amount, write "10 X 100" on the back of the check, and send a messenger to the bank to cash it. The messenger would bring the proceeds in $100 bills to her at 17 State Street, and she would give the bills to Smith and make the necessary entries in the books to reflect a disbursement of cash and a *75 reduction in the credit balance in the "Commission Suspense: United Fruit" account. The amounts received by Smith during each of the taxable years from the proceeds of $1,000 checks charged to the suspense account were as follows: 1947
$1,000.00
1948
3,000.00
1949
5,000.00
1950
5,000.00
1951
6,000.00
1952
3,000.00 Some of the $1,000 checks were signed by Smith and some by Eleanor McCarthy or some other officer of Piership. During the taxable years it was a common practice for stevedoring and watching and guarding companies on the New York waterfront to expend money for "gratuities" of one kind or another. They all had an account on their books labeled "Travel and Entertainment", and some of them had an account called "Expediting". Practically all of the stevedoring companies had an account on their books labeled "Ships Officers" which contained a "gratuity" normally paid to every incoming ship's captain or mate, sometimes called "Buying the Captain's hat". Many of the stevedoring and watching companies had an account labeled "Delgates" for "gratuities" paid to delegates representing the longshoremen's union. At times, particularly during the Korean War *76 years, both Piership and Clark experienced difficulty in getting men to work on the piers, and, in order to secure the cooperation of various individuals on the waterfront and to promote goodwill, Smith made certain expenditures. They included "gifts" of money to pier superintendents who were in a position to control the number of guards hired from Piership; to longshoremen, guards and other employees in the nature of handouts to get their cooperation when there was an unusual job to perform; and to Union delegates who could make it difficult to get the loading and unloading of ships done expeditiously. In addition Smith purchased theatre tickets and tickets to sporting events which he gave to ship captains and others. Smith did not keep any record of these expenditures. During the years 1948 through 1952 Piership and Clark had on their books a "Travel and Entertainment" account. Each month the officers of these corporations would tell Finkstein the amounts expended by them and he would prepare vouchers and give them to Eleanor McCarthy. Neither Finkstein nor Eleanor McCarthy ever saw any substantiation for those expenses and never asked for any. Eleanor McCarthy or Grace McMahon *77 drew checks for the amounts shown on the vouchers, the checks were cashed and the proceeds given to the officers, and they signed the vouchers. Officers of Piership receiving such payments were Smith, George T. Clark and Harold J. Beardell. The amounts received by Smith from Piership and Clark as reimbursement for travel and entertainment expenses during the taxable years were as follows: Year
Piership
Clark
1947
1948
$1,311.20
1949
1,646.30
1950
2,443.00
$6,039.65
1951
4,408.00
4,407.75
1952
5,817.00
5,753.50
In their income tax returns for the taxable years 1947 through 1952, petitioners reported the following adjusted gross income and tax liability: Adjusted
Income Tax
Year
Gross Income
Liability
1947
$20,186.79
$5,337.71
1948
19,864.04
3,474.52
1949
20,000.00
3,527.78
1950
25,095.49
5,270.66
1951
23,500.00
5,196.20
1952
28,708.42
7,989.80 The proceeds of the $1,000 checks received by Smith during those years were not included in the income reported in their returns. Respondent determined that the gross income reported by petitioners in their returns for the taxable years was understated as follows: *78 1947
1948
1949
"Piership Commissions"
$1,000.00
$3,000.00
$5,000.00
"Piership Expenses"
1,311.20
1,646.30
"Clark & Son Expenses"
"Algam Expenses" **
"Algam Stock" **
TOTALS
$1,000.00
$4,311.20
$6,646.30
1950
1951
1952
"Piership Commissions"
$ 5,000.00
$ 6,000.00 *
$ 3,000.00
"Piership Expenses"
2,443.00
4,408.00
5,817.00
"Clark & Son Expenses"
6,039.65
4,407.75
5,753.50
"Algam Expenses" **
12,500.00
"Algam Stock" **
28,333.33
TOTALS
$41,815.98
$27,315.75
$14,570.50
Petitioners' estimate of income tax in their declarations of estimated tax plus tax actually withheld on salary received by Smith amounted to $3,476.12 for the year 1948, $3,322.59 for the year 1949, and $4,655.78 for the year 1951. *79 In 1959 Smith was tried in the United States Court for the Southern District of New York for willfully attempting to evade a part of the income taxes due and owing by him for the years 1950, 1951 and 1952 by failing to report in his returns for those years the proceeds of the $1,000 checks received by him from Piership in those years amounting to $5,000, $6,000 and $3,000, respectively, and was acquitted. Petitioners' income tax returns for each of the years 1947 through 1952 were not false or fraudulent with intent to evade tax. Opinion RAUM, Judge: The dispositive question in this case is whether petitioners' returns for the years 1947-1952 were fraudulent with intent to evade tax so as to lift the bar of the statute of limitations, which concededly would otherwise render the deficiency notice untimely. The Government's contention that the returns were tainted by the requisite fraud is based solely on the proceeds of the $1,000 checks which Smith received each year from Piership and did not report in his returns. If such proceeds constituted income to him, at least in part, there would be a basis for the Government's position. However, the burden of proof was upon it, and *80 we cannot find that such burden has been discharged. It is not disputed that Smith received such proceeds and that false entries were made upon the corporation's books to disguise the nature of the payments. But the evidence convinces us that such amounts were paid to Smith to be distributed by him in behalf of the corporation as graft or commercial bribes along the waterfront to Union delegates, superintendents, and, to a lesser degree, to ship captains and others. If he in fact so used these funds for the corporation's benefit they were not income to him. Whether they would be deductible by the corporation is a question that is not in issue. Cf. Frederick Steel Co., 42 T.C. 13, 24-25. But before the amounts in question or any parts thereof can be classified as income to Smith it must be established that he retained those amounts or portions thereof for his own benefit. The record is devoid of such proof, and we must hold that the Government has failed to carry its burden of proof. True, we had little confidence in Smith as a witness; he appeared all too ready to bend the facts to meet the exigencies of the situation as he understood them. Yet, his testimony that *81 he was paying considerable sums of money to the Union delegates, superintendents, ship captains and others had a ring of validity, and we are satisfied that at least part of the proceeds of the $1,000 checks was expended for such purposes. Perhaps, if the burden were on him, we might not be able to find that all of the amounts were thus distributed by him. But the burden was not upon him; it was upon the Government. The evidence strongly suggests that Smith was a mere conduit for the corporation in paying graft or commercial bribes, and the Government has not convincingly shown that any part of the amounts involved was retained by Smith for his own benefit. In view of the failure of proof, Decision will be entered for the petitioners. Footnotes
**. No issue is presented for decision involving "Algam".↩
*. The parties have stipulated that page 2 of the statement attached to the statutory notice of deficiency is in error as to the year 1951 in that the alleged unreported income from "Piership Commissions" should be $6,000.00 and there should be no allegation of unreported income in that year in the amount of $6,000.00 from "Algam Commissions". ↩