GREATER DISPLAY & WIRE FORMING, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Greater Display & Wire Forming, Inc. v. Commissioner
Docket No. 584-83.
United States Tax Court
T.C. Memo 1988-231; 1988 Tax Ct. Memo LEXIS 259; 55 T.C.M. (CCH) 922; T.C.M. (RIA) 88231; May 23, 1988; As amended May 23, 1988 Bernard B. Spindel, for the petitioner. Peter J. Devlin, for the respondent. WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION WRIGHT, Judge: By notice of deficiency dated October 15, 1982, respondent determined the following deficiencies and additions to tax in petitioner's Federal income taxes: Additions to Tax
Tax Year Ended
Deficiency
Sec. 6653(b) [1]
Aug. 31, 1972
$  5,893.90
$  2,946.95
Aug. 31, 1973
8,587.47
6,634.66
Aug. 31, 1974
4,478.18
2,239.09
Aug. 31, 1975
5,074.28
3,273.72
Total
$ 24,033.83
$ 15,094.42
*261 The issues for consideration are: (1) Whether respondent may use evidence, testimony or information relating to a grand jury proceeding at trial in this case where an order under rule 6(e), Federal Rules of Criminal Procedure authorizing the disclosure of grand jury material, was not issued in accordance with the standards later enunciated in Baggot,[2] and Sells;[3]
(2) If not, whether checks executed and negotiated by petitioner should have been excluded from evidence on the grounds that their admission into evidence reveals "matters occurring before the grand jury," the disclosure of which may be only pursuant to a new rule 6(e) order upon a showing of "particularized need"; (3) Assuming that these checks or portions thereof were properly admitted as evidence in this proceeding, whether kickbacks paid by petitioner in each of the taxable years at issue may be deducted as a business expense under section 162; (4) Whether petitioner *262 is liable for additions to tax for fraud under section 6653(b); and (5) Whether the assessment is barred by the statute of limitations. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of fact and the exhibits attached thereto are incorporated herein by reference. Greater Display & Wire Forming, Inc. (petitioner or Greater Display), is a corporation with its principal place of business in Warwick, (Orange County) New York. Petitioner, a manufacturer of wire products, display racks and giftware, was incorporated pursuant to the laws of the State of New York and commenced operating in 1971. Petitioner filed Forms 1120, Corporate Income Tax Returns, for the fiscal years ended August 31, 1972, August 31, 1973, August 31, 1974 and August 31, 1975, with the Internal Revenue Service Center, Andover, Massachusetts. Approximately five years before petitioner commenced operations, an individual named Edward Kavalec (Mr. Kavalec) sold a wire products business known as Able Wire and *263 Frame Corporation (Able Wire) to William McGuire (Mr. McGuire). Mr. McGuire, along with Joseph Intermor (Mr. Intermor), became the shareholders and corporate officers of Able Wire. In 1968, Able Wire began manufacturing and designing display racks for chewing gum produced by the American Circle Division of Warner-Lambert Company (American Chicle Division). When Able Wire first conducted business with the American Chicle Division, the latter's purchasing agent did not request or demand any type of kickback payment in order for Able Wire to secure business from that company. Subsequently, John "Jack" Thornley (Mr. Thornley) became the purchasing agent for the American Chicle Division. In his capacity as purchasing agent, Mr. Thornley decided which party would receive a contract to manufacture display racks for the American Chicle Division. When Mr. Thornley assumed the position of purchasing agent, he demanded that Able Wire pay kickbacks in order to secure business from the American Chicle Division. Able Wire complied with Mr. Thornley's demands. However, Able Wire did not pay kickbacks to any party except Mr. Thornley. In 1971, Mr. Kavalec was involved in manufacturing *264 wire products and display racks in conjunction with petitioner's predecessor business. Due to ill health, he could no longer carry on his wire products business. Mr. Kavalec and his wife, Josephine, then secured the assistance of Mr. Intermor and Mr. McGuire, who in addition to purchasing Able Wire in 1966, had other businss dealings with Mr. Kavalec. Petitioner began operating in 1971 with Josephine Kavalec as president, Joseph Intermor as vice president, and William McGuire as secretary/treasurer. [4] During the taxable years in issue, Mrs. Kavalec, a 34 percent shareholder of petitioner's outstanding capital stock, did not participate in the management and operations of president. These duties were assumed by Mr. Intermor and Mr. McGuire, who each owned 33 percent of the stock. When petitioner commenced operations in 1971, petitioner's representatives agreed to pay kickbacks to Mr. Thornley in order to secure contracts with the American Chicle Division. Specifically, in furtherance of petitioner's *265 interest, Mr. Intermor and Mr. McGuire, on behalf of petitioner, consented to and authorized the payment of the kickbacks to Mr. Thornley. During the subject taxable years, Mr. and Mrs. Kavalec would execute blank checks drawn on petitioner's account which required the signature of Mr. McGuire or Mr. Intermor as co-maker. Acting pursuant to the direction of Mr. Intermor and/or Mr. McGuire, Lucie Key (Ms. Key), petitioner's bookkeeper and office manager, prepared the subject checks and made them payable to either cash, various fictitious names or to actual entities. The fictitious names utilized on the subject checks were Al Wire, All Wire Co., Cashman, Cashman Products, Al Wire Corp., J. Cashman, Chas. Thompson and John J. Thompson. The actual entities utilized on the subject checks were Able Wire and Jomar. [5]
Following the preparation of the subject checks, either Mr. Intermor or Mr. McGuire would execute the checks as co-maker. Ms. Key then would endorse the back of the checks, cash same, and remit the cash to Mr. Intermor or Mr. McGuire. In rare instances, Mr. McGuire or Mr. *266 Intermor themselves would cash the subject checks. Upon receiving the cash from the negotiated checks, Mr. Intermor and/or Mr. McGuire then remitted the kickbacks in the form of cash to Mr. Thornley. As directed by Mr. Intermor and/or Mr. McGuire, Ms. Key charged several accounts on petitioner's books and records in reference to the kickbacks paid Mr. Thornley. Pursuant to Mr. Intermor's and/or Mr. McGuire's direction, Ms. Key charged the kickbacks to various fictitious entities (such as Cashman Industrial Products, Cashman Products) resulting in a charge to purchase expenses being reflected on petitioner's original books and records. Petitioner claimed these purchase expenses on its corporate tax returns for the years at issue as part of its cost of goods sold. On its corporate income tax returns for the taxable years ended August 31, 1972 through August 31, 1975, petitioner claimed the following kickbacks remitted to Mr. Thornley as part of its cost of goods sold: For The Taxable Year Ended 8/31/72
Date
Check #
Payee
Amount
9/20/71
118
Cash
$  2,000.00
12/2/71
456
Cash
1,200.00
1/17/72
626
Cash
1,000.00
3/6/72
711
Cash
2,000.00
3/29/72
767
Cash
2,300.00
4/10/72
806
Cash
2,000.00
6/27/72
983
Cash
2,600.00
8/10/72
1080
Cash
2,000.00
Total
$ 15,000.00
*267 For The Taxable Year Ended 8/31/73
Date
Check #
Payee
Amount
10/18/72
1233
Cash
$  2,000.00
10/31/72
1265
Cash
1,000.00
12/14/72
1347
Cash
2,000.00
2/1/73
1433
Cash
2,000.00
4/12/73
1570
Cash
2,000.00
5/14/73
1632
Cash
2,000.00
6/7/73
1701
Al Wire
2,010.93
7/24/73
1786
Cashman
2,000.00
8/2/73
1820
Al Wire Co.
2,000.82
Total
$ 19,011.75
For The Taxable Year Ended 8/31/74
Date
Check #
Payee
Amount
11/23/73
2049
Cashman Products
$  2,000.00
11/27/73
2070
Cashman Products
2,000.00
2/21/74
2257
Al Wire Corp.
2,000.00
3/5/74
2284
Cash
2,000.00
3/28/74
2327
Cash
1,200.00
4/1/74
2332
Cash
1,000.00
4/4/74
2341
Cash
5,000.00
6/3/74
2464
J. Cashman
2,000.00
6/11/74
2501
Chas. Thompson
2,000.00
6/27/74
2522
Al Wire
2,000.00
7/18/74
2565
Al Wire
2,010.45
Total
$ 23,210.45
For The Taxable Year Ended 8/31/75
Date
Check #
Payee
Amount
9/19/74
2699
Al Wire
$ 2,000.00
10/7/74
2754
John J. Thompson
2,000.00
10/24/74
2774
Al Wire
2,000.00
4/8/75
3193
Cash
500.00
6/12/75
3357
Cash
500.00
Total
$ 7,000.00
*268 On its income tax return for the taxable year ended August 31, 1975, petitioner also claimed as part of its cost of goods sold the following checks which respondent disallowed in his statutory notice of deficiency: [6]
Date
Check #
Payee
Amount
3/20/75
3135
Able Wire
$ 3,360.00
3/25/75
3147
Able Wire
3,783.00
5/15/75
3296
Jomar
2,907.96
6/23/75
3385
Able Wire
2,419.00
7/24/75
3460
Jomar
2,900.00
Total
$ 15,369.96
Excluding small bills paid out of petty cash, petitioner's expenses were normally paid by check paid upon invoices submitted by petitioner's creditors. No invoices existed in reference to the kickbacks remitted to Mr. Thornley. Petitioner never issued Forms 1099 or W-2 statements with respect to the kickbacks paid Mr. Thornley. During the taxable years in issue, approximately 50 percent of petitioner's business involved the manufacturing of display racks for the American Chicle Division. Petitioner obtained all of its other business without paying kickbacks. During the years in issue, *269 it was illegal under New York law to confer any benefit upon any employee without the consent of the latter's employer with intent to influence his conduct in relation to his employer's affairs. [7]
After learning of Mr. Thornley's demand for kickbacks, the American Chicle Division fired Mr. Thornley. Prior to that time, however, the American Chicle Division neither was aware of nor consented to Mr. Thornley receiving kickbacks. The American Chicle Division continued doing business with petitioner after firing Mr. Thornley, but petitioner did not pay kickbacks to secure contracts with that company. In February 1975, Internal Revenue Service (IRS) Special Agent John Tampa was assigned to investigate the income tax liabilities of Mr. Thornley. While conducting his investigation, which occurred through July 1976, Special Agent Tampa contacted petitioner's representatives, including Mr. Intermor. When interviewed in 1975, Mr. Intermor denied that he paid kickbacks to Mr. Thornley, but *270 he later recanted this denial. Subsequently, upon the authorization of the Tax Division, United States Department of Justice, a Federal grand jury investigation (the grand jury) was commenced with respect to Mr. Thornley and various entities, including petitioner and Able Wire. Pursuant to a subpoena, all of petitioner's records were surrendered to the grand jury. Special Agent Tampa and Revenue Agent Anthony Competella were assigned to assist with the grand jury proceeding. During the course of the grand jury's investigation, these agents examined all the checks in issue here, as well as the books and records belonging to petitioner, Able Wire and Jomar. Petitioner was not indicted by the grand jury. On December 1, 1978, the grand jury returned petitioner's records to Josephine Kavalec. Subsequently, respondent obtained information from the Federal grand jury investigation of petitioner in the U.S. District Court for the Eastern District of New York pursuant to that court's order of March 20, 1980, under rule 6(e), Fed. R. Crim. P. (the rule 6(e) order). The rule 6(e) order authorized the release of "all books, records and documents subpoenaed by or presented to the grand *271 jury * * * and the transcripts of testimony presented to the grand jury in that connection for purposes of determining, establishing, assessing and collecting the Federal civil tax liabilities of * * * Greater Display and Wire Forming, Inc., and for use in any judicial proceeding related thereto." Petitioner has not instituted any proceeding in Federal district court to invalidate or vacate this order, nor has respondent obtained any further rule 6(e) orders applicable for purposes of this proceeding. In 1981, Revenue Agent Mark Brody conducted a civil examination using transcripts of grand jury testimony, the Special Agent's report and the workpapers of Special Agent Tampa and Revenue Agent Campetella. [8] Thereafter, in a statutory notice of deficiency stated October 15, 1982, respondent disallowed petitioner's claimed cost of goods sold to the extent of the checks identified above and further determined that petitioner was liable for additions to tax for fraud under section 6653(b). *272 OPINION
Procedural Matters
Subsequent to the issuance of the rule 6(e) order involved here, the Supreme Court decided two cases interpreting the requirements of rule 6(e). [9] In United States v. Baggot,463 U.S. 476 (1983), the Court held that a civil tax audit is not "preliminar[y] to or in connection with a judicial proceeding" within the meaning of rule 6(e)(3)(C)(i). Consequently, disclosure is not permitted under rule 6(e) for purposes of a civil tax audit even if the results of that audit lead to litigation because the purpose of the audit is to determine a tax liability administratively and not to prepare for litigation. In United States v. Sells Engineering, Inc.,463 U.S. 418 (1983), the Court held that rule 6(e) was not intended to grant free access to grand jury materials to attorneys other than those involved in the criminal investigation to which the grand jury materials pertained. Thus, attorneys in the Civil Division of the Justice Department could not obtain disclosure of grand jury materials without first obtaining a court order *273 under rule 6(e)(3)(C)(i), which would be granted only upon a showing of particularized need for the information. *274 The rule 6(e) order at issue in this case does not satisfy the "preliminar[y] to or in connection with a judicial proceeding" standard or the "particularized need" standard enunciated in Baggot and Sells and respondent so concedes. At trial, petitioner moved to prohibit respondent from presenting any information, evidence or testimony obtained through the rule 6(e) order in light of the two Supreme Court cases. We denied petitioner's motion at that time. On brief, petitioner renews its objection. Respondent, relying on our opinion in Kluger v. Commissioner,83 T.C. 309 (1984), contends that the standards in Sells and Baggot are not to be applied retroactively to invalidate rule 6(e) orders issued prior to the date those decisions were issued, [10] and therefore argues that the evidence need not be suppressed. *275 The evidentiary dispute in this case centers around checks issued by petitioner during the taxable years in issue which were later subpoenaed by the grand jury. The parties have stipulated that checks totalling $ 15,100.00, $ 19,011.75, $ 23,210.45 and $ 7,000.00 which petitioner claimed as part of its cost of goods sold on its Form 1120 income tax returns for taxable years 1972, 1973, 1974 and 1975, respectively, represented kickbacks paid to Mr. Thornley, purchasing agent of the American Chicle Division. Photocopies of these checks, which bear a grand jury sticker and a government exhibit number, were admitted into evidence without objection from petitioner as a part of the joint stipulation of facts and exhibits. Besides the checks which the parties stipulated as representing kickbacks paid Mr. Thornley, respondent also disallowed checks totalling $ 15,369.96 for fiscal year ended August 31, 1975, which were payable to actual entities. Unlike the other checks, however, neither the originals nor photocopies of the checks paid to Jomar and Able could be located for use at trial. Petitioner has alleged that these five checks are not available because an employee of the U.S. Attorney's *276 office "retrieved" them after they were returned to petitioner at the conclusion of the grand jury proceeding. With respect to the checks that could not be located, at trial, respondent called Special Agent Tampa and Revenue Agent Campetella to the stand. During the course of the grand jury investigation these agents had examined all the subpoenaed checks and other business records. Relying on rule 1004, Fed. R. Evid., we allowed their testimony as secondary evidence to prove the contents of the missing checks. [11] Despite petitioner's claims, there was no evidence presented that these checks were lost or destroyed in bad faith or "retrieved" by an employee of the U.S. Attorney's office. *277 Petitioner has raised the issue of whether rule 6(e) orders issued prior to Baggot and Sells permit respondent's continued use or access to evidence, testimony or information developed during the course of a grand jury proceeding at subsequent adversarial proceedings. Because of opinions issued by various appellate courts, as well as by this Court since the trial in this case, we will therefore reexamine the admissibility of the checks in issue. We begin by noting that the courts of appeal, in considering this precise problem, have not reached a consensus of opinion. In United States v. (Under Seal),783 F.2d 450 (4th Cir. 1986), cert. denied sub nom. Ravens Hollow, Ltd. v. United States,481 U.S.   , 107 S. Ct. 1964 (1987), the taxpayers moved in district court to vacate a rule 6(e) order and to restrain future use of the materials obtained and continually used pursuant to that order. The district court denied the relief sought and the Fourth Circuit affirmed on the grounds that Baggot and Sells were not to be applied retroactively. The Fourth Circuit held that because the existing order remained valid, continuing use *278 of the grand jury materials would not violate rule 6(e). In light of this holding, the court of appeals did not address the taxpayers' claim that the continued use was "synonymous with disclosure." See also In re Disclosure of Grand Jury material Basic Earth Science System, Inc.,821 F.2d 1290 (7th Cir. 1987) (concept of retroactivity did not apply where district court order had become final judgment). The Second Circuit, to which an appeal lies herein, reached the opposite conclusion. In re Grand Jury Proceedings (Henry Kluger, Deceased),827 F.2d 868 (2d Cir. 1987) (Estate of Kluger). Like the taxpayers in (Under Seal), supra, the decedent's estate moved to have the rule 6(e) orders issued prior to and not in compliance with Baggot and Sells vacated on the ground that the decisions in Baggot and Sells should be applied retroactively. In affirming an opinion of the district court, the Second Circuit agreed that Baggot and Sells should not be applied retroactively to invalidate previous disclosures. Based on its determination that each subsequent use of grand jury materials constitutes a new disclosure, however, *279 the court of appeals concluded that pre-Baggot and Sells orders should not be given prospective effect. The Second Circuit noted that while the grand jury had terminated, there nevertheless remained significant secrecy concerns because the existing rule 6(e) order did not limit the number of people who would have access to the grand jury materials and because the materials were to be used in the actual adversarial proceeding. Thus, although the determinations of civil tax liability which respondent has based on materials obtained from the grand jury remained valid, the government was denied further access to the grand jury materials for use in pending civil tax litigation until it could establish a "particularized need" for the materials. We recently considered whether an existing rule 6(e) order permitted respondent to use grand jury materials in preparing for trial or whether such use constituted a new disclosure. In a court reviewed opinion, Hajecate v. Commissioner,90 T.C. 280 (1988), we held that respondent could not rely on the rule 6(e) order issued prior to, and not satisfying the requirements of, Sells to authorize a new disclosure of grand *280 jury materials by using such materials to prepare for trial. In Hajecate the taxpayers had been targeted for a grand jury investigation in the late 1970's. In 1979 and 1981, respondent obtained rule 6(e) orders permitting respondent to examine transcripts and testimony and materials relating to several grand jury investigations in order to determine whether or not any civil tax liabilities might arise therefrom. Thereafter, respondent lost track of the grand jury materials which had been turned over to him and, in fact, did not discover such materials until November 1986. Both respondent and the taxpayers were unaware of the contents of the more than 70 boxes of documents and transcripts of the grand jury proceedings. Respondent's agents and attorneys were different than the original determinators of the deficiencies and it was necessary for new IRS personnel to reexamine the contents of those boxes for use, if necessary, in the pending litigation in that case. In Hajecate we reconciled the facts with the opinions issued by the Second and Fourth Circuits. We emphasized that in United States v. (Under Sell), supra, much of the grand jury material *281 already had been disclosed to the public in the course of a criminal trial, and unlike the situation in Hajecate, the IRS had been using the materials without interruption for over four years. Although we noted that while the facts in Estate of Kluger, supra, were not sufficiently detailed for purpose of comparison with those in Hajecate, we nevertheless concluded that the facts in Hajecate presented a strong case in favor of applying Sells prospectively to deny respondent renewed access to the grand jury material. Relying on United States v. John Doe, Inc. I,481 U.S.   , 107 S.Ct. 1656 (1987), we held that reexamination of the materials by respondent after a five-year lapse in which he lost custody and no longer remembers the contents of the materials, is, in the ordinary sense of the words, "a new use or disclosure." In any event, we are obliged to follow the Second Circuit's decision in Estate of Kluger which held that rule 6(e) orders, issued prior to Baggot and Sells, are not to be given prospective effect. Golsen v. Commissioner,54 T.C. 742 (1970), *282 affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971). Therefore, we must determine whether any of the information, evidence, or testimony presented at trial reveals "matters occurring before the grand jury" requiring respondent to seek a new rule 6(e) order upon a showing of particularized need before using such grand jury material. If not, then rule 6(e) is inapplicable, and respondent does not need a court order to use such evidence at trial.
The purpose of rule 6(e) is to protect the "essence of what takes place in the grand jury room." In re Grand Jury Investigation,630 F.2d 996, 1000 (3d Cir. 1980), cert. denied 449 U.S. 1081 (1981). Thus, its scope extends to "anything which may reveal what occurred before the grand jury." In re Grand Jury Matter Catania (Catania),682 F.2d 61, 63 (3d Cir. 1982), or "information which would reveal the identities of witnesses or jurors, the substance of testimony, the strategy or direction of the investigation, the deliberation or questions of the jurors, *283 and the like." Fund for Constitutional Govt. v. National Archives & Records Serv.,656 F.2d 856, 869 (D.C. Cir. 1981), quoting SEC v. Dresser Industries, Inc.,628 F.2d 1368, 1382 (D.C. Cir.) (en banc), cert. denied 499 U.S. 993 (1980). The disclosure of information developed during an independent IRS investigation conducted prior to the grand jury proceeding, however, does not violate rule 6(e). Sisk v. Commissioner,791 F.2d 58 (6th Cir. 1986), affg. an unpublished opinion of this Court. See also In re Grand Jury Investigation (Catania), supra.Further, rule 6(e) does not shield for all time revelation of information that was previously presented to a grand jury. United States ex rel. Woodward v. Tynan,757 F.2d 1085, 1087 (10th Cir. 1985), and cases cited therein. Accordingly, when testimony or records examined by a grand jury are sought for purposes other than to learn what took place before the grand jury, grand jury secrecy is not compromised and rule 6(e) does not apply. United States v. Interstate Dress Carriers, Inc., 2800 F.2d 52, 54 (2d Cir. 1960). *284 With this background in mind, we conclude that the copies of the checks which the parties stipulated as representing kickbacks paid to Mr. Thornley are not grand jury material. These checks, a part of petitioner's business records, were created independently of and had an unrelated use to the grand jury proceedings. As such, these checks, standing alone, do not reveal the "essence of the grand jury proceedings." See United States v. Weinstein,511 F.2d 622 (2d Cir. 1975) (expressing doubt that grand jury exhibits would be matters occurring before the grand jury). We conclude that copies of these checks, which the parties attached to their joint stipulation as an exhibit, were properly admitted into evidence. We reach a different conclusion with respect to the five checks which could not be located and were payable to actual entities. In attempting to prove the existence and contents of the missing five checks respondent presented testimony from Special Agent Tampa and Revenue Agent Campetella. Through their testimony these agents basically outlined the scope of their investigation during the course of the grand jury proceeding. They set forth their conclusions *285 as to whether these five checks were issued in comport with the normal business practices between petitioner and Able Wire and Jomar. Their testimony reveals, in part, the substance of the grand jury investigation. Based on the holding in Estate of Kluger, the use of this testimony in an adversarial proceeding constitutes a disclosure of "matters occurring before the grand jury," and must be stricken from the record because respondent did not obtain a new rule 6(e) order authorizing its use. Accordingly, because these checks are not available and their contents may not be established through testimonial secondary evidence under the particular circumstances here, we will exclude the checks payable to Jomar or Able Wire from the deficiency computation and from our consideration as to whether a deduction for these amounts was fraudulent. The Tax Issue
We now turn to the primary issue of whether the kickback payments are deductible business expenses under section 162. [12]In general, section 162(a) allows a taxpayer to deduct "all the ordinary and necessary expenses paid or incurred *286 during the taxable year in carrying on any trade or business." Section 162(c)(2), which qualifies this general rule by disallowing a trade or business expense deduction for certain illegal payments, however, provides in pertinent part as follows: (2) OTHER ILLEGAL PAYMENTS. -- No deduction shall be allowed under subsection (a) for any payment * * * made, directly or indirectly, to any person, if the payment constitutes an * * * illegal payment * * * under any law of a State (but only if such State law is generally enforced), which subjects the payor to a criminal penalty of the loss of license or privilege to engage in a trade or business. * * * The burden of proof in respect of the issue, for purposes of this paragraph, as to whether a payment constitutes an * * * illegal payment shall be upon the Secretary or his delegate to the same extent as he bears the burden of proof under section 7454 (concerning the burden of proof when the issue relates to fraud). *287 In defining the term "generally enforced" as it is used in section 162(c)(2), section 1.162-18(b)(3), Income Tax Regs., provides that --
a State law shall be considered to be generally enforced unless it is never enforced or the only persons normally charged with violations thereof in the State * * * enacting the law are infamous or those whose violations are extraordinarily flagrant. For example, a criminal statute of a State shall be considered to be generally enforced unless violations of the statute which are brought to the attention of appropriate enforcement authorities do not result in any enforcement action in the absence of unusual circumstances. Petitioner argues that the kickback payments constituted ordinary and necessary expenditures to secure the business of American Chicle Division and are not barred from being deductible under section 162(c)(2) as illegal payments made in violation of a State statute under which is generally enforced. In furtherance of its argument, petitioner alleges that respondent must show by "clear and convincing evidence" that the kickbacks were illegal under a generally enforced New York statute. Analogizing *288 the facts here to those in Custis v. Commissioner,T.C. Memo. 1982-296, petitioner asserts that respondent has failed to carry his burden. Respondent replies that petitioner has not shown the expenses to be ordinary and necessary and, in any case, the expenses may not be deducted because they violate a generally enforced New York statute. It is clear that the deductibility of a kickback payment hinges not only on avoiding the disallowance provisions of section 162(c)(2) but is dependent upon satisfaction of the general requirements of section 162(a). Prior to this enactment of section 162(c)(2), a deduction for a kickback would be disallowed if such payment was not ordinary or necessary. See Diamond v. Commissioner,56 T.C. 530 (1971), affd. 492 F.2d 286 (7th Cir. 1974). Whether a payment is ordinary and necessary is a question of fact upon which petitioner bears the burden of proof. Welch v. Helvering,290 U.S. 111 (1933). *289 The word "ordinary" means normal, usual or customary, and accordingly the payments in issue must be of a type which are common to, or frequently occur in, the type of business in which petitioner is engaged. Lilly v. Commissioner,343 U.S. 90 (1952); Deputy v. du Pont,308 U.S. 488 (1940); United Draperies, Inc. v. Commissioner,41 T.C. 457, 463 (1964), affd. 340 F.2d 936 (7th Cir. 1964). See Bertolini Trucking Co. v. Commissioner,736 F.2d 1120 (6th Cir. 1984), revg. on other grounds a Memorandum Opinion of this Court (taxpayer may deduct any expenditure, including kickbacks, which is ordinary and necessary, and legally made, and the Commissioner may not disallow such deduction on public policy grounds. The Supreme Court has held that "necessary" as used in section 162 imposes "only the minimal requirement that the expense be 'appropriate and helpful' for 'the development of the [taxpayer's] business.'" Commissioner of Internal Revenue v. Tellier,383 U.S. 687, 689 (1966) (citations *290 omitted). See, however, Car-Ron Asphalt Paving Co. v. Commissioner,758 F.2d 1132 (6th Cir. 1985), affg. a Memorandum Opinion of this Court (payment of kickbacks were not appropriate or helpful with respect to taxpayer's business). The facts of the instant case reflect that the kickbacks were not "ordinary" within the purview of section 162. In response to respondent's interrogatories, petitioner stated that "it was unable to establish the customary or usual acts of kickbacks in the industry." At trial, petitioner failed to produce any evidence which would suggest that kickbacks are normal and customary in its particular industry. Neither petitioner nor Able Wire, a company engaged in an identical endeavor, paid kickbacks to any party other than Mr. Thornley to obtain business. Thus, it does not appear that such expenditures were customary in the wire manufacturing business. See Frederick Steel Co. v. Commissioner,42 T.C. 13 (1964), revd. on other grounds 375 F.2d 351 (6th Cir. 1967) (commercial bribes not "ordinary" because there was no reliable evidence that other similar arrangements or practices were common in the industry); *291 United Draperies, Inc. v. Commissioner, supra (taxpayer failed to show that it normally made such payments or that such payments were commonly made in the industry); Diamond v. Commissioner, supra.
We recognize that during the years in issue, when petitioner was in its infancy, 50 percent of petitioner's business was derived from its contracts with American Chicle Division. However, once Mr. Thornley was fired, petitioner continued to do business with American Chicle Division without paying kickbacks. It is apparent that the company did not find kickback payments to be an "appropriate" method of conducting business. Thus, it is not a foregone conclusion that the payments were absolutely necessary. Even assuming that such kickbacks qualified under the general requirements of section 162(a) the question of their legality remains in dispute. Therefore, we must determine whether such kickbacks are deductible business expenses not paid in violation of a "generally enforced" State statute within the meaning of section 162(c)(2). Although respondent acknowledges that the statute, regulations and legislative history requires that he bear the burden *292 of proof as to whether a payment constitutes an illegal bribe, kickback or illegal payment, he takes issue with petitioner's argument that he bears the burden of showing that a State law is generally enforced within the purview of section 162(c)(2). Respondent argues that the cases of this Court which so hold should not be followed because they are contrary to the legislative history and the Treasury regulations. We find respondent's argument to be misplaced. The statutory section makes it clear that a decision as to whether or not a payment is illegal under the laws of a particular state necessarily involves a determination of whether the laws of that state are generally enforced. The wording of section 162(c)(2) does not set forth burdens that are mutually exclusive, but rather entwines the elements of burden of proof. Accordingly, we will follow our previous decisions which reflect this standard of proof. [13] In any case we find that respondent has met his burden of proving that the applicable statute, section 180, New York Penal Law, was generally enforced. *293 At trial, Joseph Brown, the District Attorney of Orange County, New York, testified that the kickbacks paid by the petitioner violated section 180 of New York's Penal Law. As District Attorney of Orange County (where petitioner is located) he emphatically stated that he would have prosecuted this particular case had it been brought to his attention. Acknowledging that there were no prosecutions in Orange County during the years in issue, District Attorney Brown attributed this to chronic understaffing and a lack of investigators. [14] as we previously emphasized in Boucher v. Commissioner,77 T.C. 214, 219 (1981), affd. 693 F.2d 98 (9th Cir. 1982), the absence of an aggressive policy of detection of violations of the statute is not fatal to a statute's being considered "generally enforced" when there were other factors explaining the lack of a prosecutorial record under that provision. Moreover, unlike the situation in Custis v. Commissioner, supra, upon which petitioner relies, respondent here has presented evidence of general enforcement *294 under the statute. In fact, during the years in issue there were two prosecutions under the New York statute. See People v. Axel,69 Misc.2d 216, 329 N.Y.S. 2d 992 (Sup.Ct. 1972), and People v. Tuttle, 44, App. Div.2d 450, 356 N.Y.S. 2d 652 (1974). Although section 162(c)(2) denies deductions for expenditures which frustrate the public policy underlying certain State laws, it does so only if the State law has not become a "dead letter." Boucher v. Commissioner,77 T.C. at 220. Even though Orange County did not have an aggressive program to enforce it, we conclude that the New York statute was not a "dead letter" during the years in issue because the statute was "generally enforced" within the State of New York at large. [15]
*295 Having found that the payments were not ordinary or necessary and further that such payments were illegal under a generally enforced State statute, we uphold respondent's determination as to the deficiencies in tax for each of the years in issue.
Fraud
The statute of limitations precludes respondent's assessment and collection of the deficiencies at issue unless respondent proves that petitioner's returns were false or fraudulent with the intent to evade tax so that the tax may be assessed "at any time." Sec. 6501(a), (c)(1). For the purposes of sections 6501(c)(1) and 6653(b), the fraud envisioned is defined as an actual, intentional wrongdoing with the specific intent to evade a tax believed to be owed… Wilson v. Commissioner,76 T.C. 623, 624 (1981); Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); McGee v. Commissioner,61 T.C. 249, 256 (1973), affd. 519 F.2d 1121 (5th Cir. 1975), cert. denied 424 U.S. 967 (1976). The burden that *296 respondent bears of proving the applicability of the section 6501 (c)(1) exception to the general three-year statute of limitations is the same burden that he bears in sustaining the additions to tax for fraud under section 6653(b). Ruidoso Racing Assoc., Inc. v. Commissioner,476 F.2d 502, 505 (10th Cir. 1973); Asphalt Industries, Inc. v. Commissioner,384 F.2d 229, 232 (3d Cir. 1967), revg. 46 T.C. 622 (1966). Respondent must establish by clear and convincing evidence (1) that petitioner underpaid his taxes during each year, and (2) that some part of petitioner's payment each year was due to fraud. Hebrank v. Commissioner,81 T.C. 640, 642 (1983); Stone v. Commissioner,56 T.C. 213, 220 (1971); sec. 7454(a); Rule 142(b). After carefully considering the entire record we conclude that respondent has carried his burden. In the instant case it has been conclusively established that, in each of the years in issue, petitioner deducted items which were not properly deductible, giving rise to deficiencies in income tax for each of the years in issue. Thus, respondent has met his burden with respect *297 to proving the existence of an underpayment for each of the years in issue. We therefore must consider whether any part of the underpayment for each year was due to fraud.
Fraud is established if it is shown that the taxpayer intended to evade taxes known or believed to be owing by conduct calculated to conceal, mislead, or otherwise prevent the collection of such taxes. Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983); Stoltzfus v. United States, supra;Webb v. Commissioner,394 F.2d 366 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Rowlee v. Commissioner, supra;Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). Fraud is never presumed, but rather must be established by affirmative evidence. Beaver v. Commissioner,55 T.C. 85, 92 (1970). *298 Respondent may carry his burden on the basis of reasonable inferences to be drawn from the record, but he may not rely on petitioner's failure to carry his burden of proof as to the underlying deficiencies. Habersham-Bey v. Commissioner,78 T.C. 304, 311-312 (1982). Moreover, as to the years in suit, respondent need only prove that "any part of any underpayment * * * is due to fraud." Sec. 6653(b)(1); Estate of Beck v. Commissioner,56 T.C. 297, 362 (1971). Direct proof of the taxpayer's intent is rarely available; therefore, fraud may be proved by circumstantial evidence. Spies v. United States,317 U.S. 492 (1943); Korecky v. Commissioner,781 F.2d 1566, 1568 (11th Cir. 1986), affg. a Memorandum Opinion of the Court; Rowlee v. Commissioner, supra.The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner, supra at 223-224; Otsuki v. Commissioner, supra.Fraud need not be proven "beyond a reasonable doubt." *299 Rule 142(b); Webb v. Commissioner, supra at 380. Fraud may be established by showing an overstatement of deductions as well as by the omission of income. Neaderland v. Commissioner,52 T.C. 532 (1969), affd. 424 F.2d 639 (2d Cir. 1970), cert. denied 400 U.S. 827 (1970); Ruidoso Racing Assoc., Inc. v. Commissioner, supra.The use of fictitious accounts is a factor in finding fraud. See C. F. Malanka & Sons, Inc. v. Commissioner,T.C. Memo. 1979-187, affd. by unpublished order (3d Cir., July 29, 1981) (taxpayers who were aware of illegal kickbacks to city officials through fictitious supply company were found to have fraudulently claimed such deductions as a cost of supplies). In the case of a corporation, the fraudulent activities of an officer or shareholder may be attributable to the corporation if (1) the wrongdoer so dominates the corporation that it is, in reality a creature of his will (his alter ego), or (2) the agent was acting in behalf of and not against the interests of, the *300 corporation with the result that the corporation benefited from the fraudulent acts. Asphalt Industries, Inc. v. Commissioner, supra;Ruidoso Racing Assoc., Inc. v. Commissioner, supra.[16]
On brief, petitioner makes several arguments or excuses for why the deductions were not made with intent to evade tax. First, petitioner notes that when respondent received the information from the grand jury pursuant to the rule 6(e) order, no omission or understatement of income was alleged. Petitioner next explains that the charges made to its purchases accounts were acts of negligence. Finally, petitioner emphasizes its origin years in mitigation, that 50 percent of its business during the first four years of operation depended upon the payment of kickbacks to Mr. Thornley, and that these kickbacks were made to acquire business, not to evade taxes. We conclude that respondent has proven by clear and convincing evidence that the understatement of income were due to fraud. In making this determination we note that Mr. Intermor and Mr. McGuire, who were *301 acting in the interest of petitioner, directed to Ms. Key, the bookkeeper to prepare checks payable either to cash or various fictitious entities. Ms. Key was further directed to report these payments on petitioner's books and records. Pursuant to the corporate officers' directions, Ms. Key charged the kickbacks to various fictitious entities, resulting in a charge to purchase expenses. These expenses, which were reflected on petitioner's original books and records, were claimed on its corporate tax returns as a part of its cost of goods sold. Petitioner does not claim that it received materials or supplies in exchange for these purchase expenses or a result of the further cash payments. Instead, the parties agreed that these payments represented kickback payments. Petitioner stipulated to its method of reflecting these payments on its books and records. The income tax returns, which were signed by Mr. McGuire as a corporate officer, show that petitioner received a tax benefit through the overstatement of cost of goods sold during each of the years in issue. Petitioner's explanations or excuses for this evasive pattern of behavior does not dissuade us from our conclusion that *302 petitioner intended to evade a tax believed to be owed. Petitioner's corporate officers, Mr. McGuire and Mr. Intermor, were experienced businessmen. Moreover, Mr. Intermor's testimony that he considered such "kickbacks a normal process of doing business" in contrary to the record which is bare of any evidence establishing that kickbacks were in fact legal or normal or customary within the industry. [17] Further, respondent presented testimony from John Clark, Purchasing Manager at Warner-Lambert Company, who emphatically denied that kickbacks were customary in the industry or were necessary to secure his company's business. Moreover, at trial it was revealed that when Mr. Intermor was interviewed in 1975, during the course of respondent's independent investigation, he denied that he paid kickbacks to Mr. Thornley. *303 He subsequently recanted this denial. A willful attempt to evade tax may be found from any conduct calculated to mislead or conceal. Thus, we find that Mr. Intermor's action is a further indicia of fraud. Beaver v. Commissioner, supra.In addition, the repetitive nature of these payments and corresponding machinations in recording them in the corporate books and records, as outlined in the joint stipulation of facts, nullifies anny thought of harmless error. Nor should such acts be mitigated by the fact that petitioner during the years in issue was a fledgling company, for with only one exception, petitioner secured business without making kickback payments. Upon consideration of the entire record, we hold that respondent has proven by clear and convincing evidence that petitioner's tax returns for the years 1972, 1973, 1974 and 1975 were filed with the fraudulent intent to evade taxes. Therefore, except as relates to the amounts payable to Able Wire and Jomar during 1975, assessment and collection of the deficiencies for each of the years in issue is not barred *304 by the statute of limitations, and we sustain the imposition of the additions to tax under section 6653(b). Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references refer to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. United States v. Baggot,463 U.S. 476↩ (1983). 3. United States v. Sells Engineering, Inc.,463 U.S. 418↩ (1983). 4. During the taxable years in issue, Able Wire and petitioner were involved in the same business, namely, the manufacturing of wire products, display racks and giftware. ↩
5. There is no evidence in the rrcord indicating the type of business conducted by Jomar. ↩
6. The parties have stipulated that these checks, which relate to fiscal year ended August 31, 1975, cannot be located. ↩
7. Section 180, N.Y. Penal Law↩ (McKinney 1975). A violation of this statute is a class B misdemeanor and is considered a white collar crime. 8. Revenue Agent Brody testified that, in determining petitioner's civil tax liabilities, he did not have petitioner's books and records in his possession. He noted that the checks in issue had been scheduled on Agent Campetella's workpapers and that he worked from those figures. Neither the workpapers, the Speecial Agent's report, nor the grand jury transcripts were presented or admitted into evidence in this proceeding. ↩
9. Rule 6(e), Federal Rules of Criminal Procedure, codifies the traditional rule of secrecy of grand jury proceedings and provides in pertinent part: (e) Recording and Disclosure of Proceedings. * * * (2) General Rule of Secrecy. -- A grand juror, an interpreter, a stenographer, an operator of a recording device, a typist who transcribes recorded testimony, an attorney for the Government, or any person to whom disclosure is made under paragraph (3)(A)(ii) of this subdivision shall not disclose matters occurring before the grand jury, except as otherwise provided for in these rules. No obligation of secrecy may be imposed on any person except in accordance with this rule. A knowing violation of Rule 6 may be punished as a contempt of court. (3) Exceptions. (A) Disclosure otherwise prohibited by this rule of matters occurring before the grand jury, other than its deliberations and the vote of any grand juror, may be made to -- (i) an attorney for the government for use in the performance of such attorney's duty; and (ii) such government personnel as are deemed necessary by an attorney for the government in the assist an attorney for the government to performance of such attorney's duty to enforce Federal criminal law. * * * (C) Disclosure otherwise prohibited by this rule of matters occurring before the grand jury may also be made -- (i) when so directed by a court preliminarily to or in connection with a judicial proceeding; * * * ↩
10. Petitioner does not challenge the validity of the notice of deficiency which concededly was based upon grand jury materials, including transcripts of testimony and the reports of the agents assigned to the grand jury. In any event, we conclude that under our decision in Kluger v. Commissioner,83 T.C. 309 (1984), the notice of deficiency is valid. Accord Terpil v. Commissioner,T.C. Memo. 1985-350↩. 11. As a general rule, this Court, which applies the Federal Rules of Evidence in its proceedings, requires that the original records or copies be introduced into evidence in proving the contents of a document. Rule 143(a), (d). Where principal sources of evidence are not available, however, this Court may look to secondary sources of the evidence in question. Specifically, under rule 1004, Fed. R. Evid.↩, other evidence, such as summaries or testimony, is also admissible to prove a document's contents if there is a satisfactory explanation for failure to produce the original. 12. As noted previously, petitioner claimed these payments on its corporate income tax return as part of its cost of goods sold. Petitioner, however, does not challenge respondent's determination that such kickbacks in question do not fit the rubric for cost of goods sold as outlined by sec. 1.61-31(a), Income Tax Regs., but rather should be treated as a potential section 162 deduction. See secs. 1.471-3(d), 1.471-11(c)(2), Income Tax Regs. Accordingly, we will not focus on the "cost of goods sold" analysis, but proceed directly to the arguments, as framed by the parties, under section 162↩. 13. See, e.g., Boucher v. Commissioner,77 T.C. 214 (1981)), affd. 693 F.2d 98 (9th Cir. 1982); Custis v. Commissioner,T.C. Memo. 1982-296↩. 14. At the time of trial, District Attorney Brown had agreed to impanel a grand jury to investigate certain areas of commercial bribery. ↩
15. Prosecutions relating to years other than the years in issue here may be gleaned from the annotations under this statute and further reflect the viability of the New York law. Section 180, as applicable to the subject tax years, was enacted in 1965 and substantially restates the provisions of former Penal Law section 439, enacted in 1909. The annotations reflect that prosecutions were made under section 439. Respondent notes that the annotations under section 180↩ originated in the 1975 publication of McKinney's which does not contain a complete record of all prosecutions. The 1984 supplement was not a part of the evidentiary record due to a change in the law in 1976. In addition, the annotations do not reflect those instances where criminal prosecutions occurred and guilty pleas were entered. 16. See also M. J. Laputka & Sons, Inc. v. Commissioner,T.C. Memo. 1981-730↩. 17. We are not required to accept testimony at face value, nor that which we consider to be inherently improbable. Urban Redevelopment Corp. v. Commissioner,294 F.2d 328, 332 (4th Cir. 1961), affg. 34 T.C. 845 (1960); Archer v. Commissioner,227 F.2d 270, 273↩ (5th Cir. 1955), affg. a Memorandum Opinion of this Court.